# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 03-1516

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

BETTE J. PREE, also known as
BETTS PREE,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Central District of Illinois.
No. 02 CR 30004—**Jeanne E. Scott**, *Judge.*

———————

ARGUED DECEMBER 12, 2003—DECIDED MAY 20, 2005

———————

Before COFFEY, RIPPLE and KANNE, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Bette J. Pree was indicted by a grand jury for one count of failing to file a tax return for the tax year 1994, in violation of 26 U.S.C. § 7203, and for two counts of filing false tax returns for the tax years 1995 and 1996, in violation of 26 U.S.C. § 7206(1). After trial, a jury found Ms. Pree not guilty of the failure to file charge but guilty of both counts of filing false tax returns. The district court sentenced Ms. Pree to 18 months' imprisonment, to be

followed by a one-year term of supervised release, with the special condition that she pay taxes owed to the Internal Revenue Service ("IRS") in the amount of $38,852. Ms. Pree appealed her convictions. On September 14, 2004, this court affirmed the judgments of conviction but vacated the sentence and remanded the case to the district court for resentencing. We stayed our mandate pending the Supreme Court's decision in *United States v. Booker*, 125 S. Ct. 738 (2005).[1] On January 12, 2005, the Supreme Court issued its decision in *Booker*. At this court's invitation, each party has submitted a memorandum presenting its views on the application of *Booker* to this case. For the reasons set forth in the following opinion, we revise our prior instructions with respect to Ms. Pree's sentence. In light of *Booker*, 125 S. Ct. 738, while retaining jurisdiction of this case, we remand this case to the district court in accordance with this court's decision in *United States v. Paladino*, 401 F.3d 471 (7th Cir. 2005).

# I

# BACKGROUND

## A. Facts

Ms. Pree was convicted of filing false returns for tax years 1995 and 1996. To present a coherent background of the

---

[1] Prior to this court's decision vacating Ms. Pree's sentence, she had completed her term of incarceration and had begun serving her term of supervised release. This court directed that any matter with respect to bail should be addressed to the district court. The Government filed an unopposed motion requesting that the district court place Ms. Pree on bond with the same conditions that were in place prior to her reporting to the Bureau of Prisons. The district court granted this motion.

circumstances upon which those convictions are based, we first must relate some events that transpired prior to those tax years.

In 1993, Maurice Furlong, the President of Health Care Centers of America ("HCCA") contacted Ms. Pree's daughter, a former lobbyist for the Illinois Chiropractic Society, about a potential job opportunity with HCCA. Ms. Pree and her daughter met Furlong, and he discussed the company and its expansion plans with them. After this meeting, Furlong developed an interest in hiring Ms. Pree as well as Ms. Pree's daughter because Ms. Pree was a nurse and held a real estate license.

After this meeting, Ms. Pree and her daughter moved to Las Vegas. On December 8, 1993, Ms. Pree signed a lease that was assigned to "HCCA—Health Care Centers of America and/or Bette Pree." Gov't Ex.81A. Ms. Pree and her daughter received approximately $4,000 from Furlong for moving expenses.

Beginning in 1994, Ms. Pree began selling HCCA stock to friends, family, former co-workers and other acquaintances. In January 1994, Ms. Pree wrote to one former co-worker and noted, "This company I work for HCCA Health Care Centers of America is going on the Stock Market right away." Gov't Ex.91A. Ms. Pree encouraged the co-worker to buy as much stock as she could. The letter further indicated: "I'm Exec. Assistant to President of Co." Gov't Ex.91A.

Ms. Pree continued selling stock through 1996. In selling stock, Ms. Pree would provide prospective purchasers with her HCCA business card on which her title was listed as "Administrator of Aquisition [sic]," Gov't Ex.15G, and would distribute company literature. She also would correspond on company letterhead. Ms. Pree explained to prospective purchasers that she had been hired to oversee

the opening of an office and "in lieu of salary they [HCCA] were issuing her stocks in the company to do with what she chose." R.67 at 106.

Although Ms. Pree began selling stock in January of 1994, she first received HCCA stock in May of 1994. The stock she received consisted of 350,000 shares of restricted stock formerly registered to Furlong. The restricted stock bore the statement: "The shares represented by this certificate have not been registered under the Securities Act of 1933 and may not be sold, transferred or otherwise disposed of by the holder unless registered under said Act . . . ." Gov't Ex.2A.[2] When a securities investigator from the Illinois Secretary of State investigated Ms. Pree's stock sales, Ms. Pree wrote a letter in response, justifying the transactions as personal sales from stock received for services. She described the stock as

> given to me by Maurice Furlong from his own personal shares for my assistance in the development and arrangement of the chiropractic presentation and business plan, and for introducing him to Chiropractors and Associates in Illinois, as well as assisting with various administrative duties or tasks.

Gov't Ex.49.

Throughout the course of Ms. Pree's stock sales, the prices at which she sold the stock fluctuated. During 1994, she sold stock at prices between a nickel and a dollar per share. During 1995, her stock prices ranged from a quarter to a dollar per share. In 1996, she sold the stock at prices between nine cents and fifty cents per share. During 1995, Ms.

---

[2] According to the stock transfer agent, who later testified at Ms. Pree's trial, the restricted stock could be sold in a private transaction.

Pree received $21,500 from sales of the HCCA stock. In 1996, Ms. Pree received $60,450 from stock sales.[3] In a 1996 declaration to a casino, Ms. Pree indicated that she had an annual income of $80,000 from stocks, retirement and social security.

Ms. Pree did not file her 1995 and 1996 tax returns when due but instead requested and received automatic extensions to file. She later met with Ann Westphal, a part-time H & R Block tax preparer, to prepare her 1995 and 1996 returns. Westphal prepared returns indicating pension and social security income for 1995 in the amount of $3,441, and pension, taxable interest and gambling income for 1996 in the amount of $7,231.[4] Neither return included any income from stock sales, nor did either return include Schedule D, the schedule on which capital gain or loss from sale of stock is calculated. Westphal prepared the returns at her home as a personal favor to Ms. Pree. Westphal did not prepare them through H & R Block, nor did she sign them. Ms. Pree ultimately signed and submitted her 1995 and 1996 tax returns on March 1, 1998. While meeting with Westphal, Ms. Pree also told her about the opportunity to purchase HCCA stock, and Westphal agreed to purchase 25,000 shares for $500 from Ms. Pree.

---

[3] Ms. Pree also earned $3,622 in gambling income in 1995 and $7,800 in 1996. Ms. Pree received W-2Gs, gambling income reporting forms, from the casinos in which these amounts were won.

[4] Specifically, the 1995 return reported no gambling winnings while the 1996 return reported $3,622 of gambling income (the amount won in 1995).

Ms. Pree later was indicted on several charges.[5] Count II charged Ms. Pree with filing an income tax return for 1995 in which she "listed total income of $3,441, whereas, as she then and there well knew and believed, she had received additional income substantially in excess of that amount in calendar year 1995." R.1 at 2. Count III charged Ms. Pree with filing an income tax return for 1996 in which she "listed total income of $7,231, whereas, as she then and there well knew and believed, she had received additional income substantially in excess of that amount in calendar year 1996." R.1 at 3.

## B. District Court Proceedings

Ms. Pree's case proceeded to trial. Before trial, Ms. Pree filed a motion in limine to exclude evidence related to fraud in her sale of stock to investors. The district court granted this motion in part, barring testimony as to whether her investors were satisfied or dissatisfied with their HCCA investments.

The Government's theory of the case, pertinent to this appeal, was that, during the relevant time period, Ms. Pree worked for HCCA and sold HCCA stock that she received as compensation for her services.[6] Despite a significant increase in her income from these stock sales and despite being informed that she had an obligation to report the

---

[5] Count I charged Ms. Pree with failing to file an income tax return for 1994. Ms. Pree was acquitted of that charge, and it is not at issue in this appeal.

[6] Ms. Pree received the stock in 1994 and 1998. Thus, the issue of whether her initial receipt of the stock from Furlong constituted taxable income is not relevant in this appeal, which deals with Ms. Pree's tax liability for 1995 and 1996.

income she received from such sales, Ms. Pree filed belated returns for 1995 and 1996, on which she willfully failed to report income from her stock sales.[7]

### 1. Evidence

At trial, the Government presented evidence pertaining to the nature of the stock Ms. Pree sold. An officer of the stock transfer agent for HCCA testified that the stock originally was registered to Furlong. In May 1994, however, Furlong's stock certificate was divided, and one of fifty-eight new certificates was issued to Ms. Pree. The transfer agent testified that the stock was restricted and that the effect of the restriction on the stock certificate was to limit the stock's value to "whatever [the seller] can obtain from the purchaser." R.67 at 25.

Several individuals who obtained stock from Ms. Pree testified to their purchases. Stipulations pertaining to Ms. Pree's stock sales to other investors also were read into evidence by the Government. The testimony and stipulations together revealed that Ms. Pree sold stock before any was registered in her name, that she sold stock after she received her certificate in May 1994, that she sold stock throughout 1995 and 1996, and that she continued selling stock after exhausting the shares originally registered in her name.[8]

---

[7] The Government also relied upon unreported income from gambling wins during those same tax years.

[8] Some investors who paid Ms. Pree in 1996 did not receive stock certificates until 1999, after new HCCA shares had been issued to Ms. Pree. Ms. Pree received one million additional shares from Furlong in May of 1998.

Additionally, the Government presented the testimony of an IRS Special Agent who investigated Ms. Pree in 1996. The Special Agent testified that Ms. Pree had indicated to her that she was aware of her obligation to report stock sales on her tax returns in the year of sale. Further, the Government presented the testimony of Westphal. Westphal testified that she had prepared Ms. Pree's 1995 and 1996 taxes in September of 1997. She testified that Ms. Pree had brought her an interest statement, pension and social security information and gambling W-2Gs. Westphal indicated that Ms. Pree had denied any other income: "We went through the return and I asked her if that was all the information she had, all the income she had, and she stated to me that it was." R.67 at 166. Westphal further testified that, after she herself purchased HCCA stock, the two discussed the need to report income from stock sales, but Ms. Pree did not indicate that any sales had been made in 1995 or 1996.

In concluding its case, the Government called Michael Welch, an IRS Revenue Agent, as a summary witness. Agent Welch had prepared an exhibit summarizing the HCCA stock sales by Ms. Pree in 1994, 1995 and 1996. The exhibit, Government Exhibit 101, was prepared from trial testimony, exhibits and the stipulations, and it was admitted without objection. Agent Welch also prepared a schedule that summarized Ms. Pree's 1994 gross income. The exhibit included the full amount received from the stock sales in 1994 in the calculation of gross income. It was admitted as Government Exhibit 102.

Agent Welch did not prepare any summaries for Ms. Pree's income for 1995 or 1996. Instead, when asked where the 1995 stock sales would have been reported on the 1995 tax return, Agent Welch testified: "On Line 13 of the face of the 1040 would be the gain or loss from sales of stock. And a schedule D would be required to itemize the

various sales." R.68 at 318. He also testified that "Line 22 is an accumulation of Line 7 through 21, [it] would include wages, interest, dividends, gain on sale, pension distributions, and that would be your total income on Line 22. Stock sales would be included there." R.68 at 318. Agent Welch testified similarly when asked about stock sales for 1996.

On cross-examination, Agent Welch testified that income from stock sales is a net figure derived from the gross sales and the cost basis of the stock.[9] In response to questions stemming from the defense theory that Furlong gave Ms. Pree the stock as a gift, Agent Welch also agreed that to calculate capital gain or loss on the sale of a gift, you must know the donor's basis, the fair market value at the time of the gift and the amount of any gift taxes paid. Agent Welch

---

[9] The following colloquy occurred between Ms. Pree's counsel and Agent Welch:

> Q. . . . You don't just report the amount of money you receive from the sale of stocks, isn't that correct?
>
> A. The Schedule D has several columns, you report the gross sale and you report the cost basis and report the net gain or loss.
>
> . . . .
>
> Q. Capital gain or loss is a net figure with respect to the sale of stock, is that correct?
>
> A. It's the net of the year's activity.
>
> Q. So if Ms. Pree sold—received the amount of money you stated she has in your summaries, that's the net—that's the money she got, that doesn't necessarily mean it is a gain or a loss, right?
>
> A. That's the sales price.

R.68 at 324-25.

admitted that he did not have information regarding Furlong's cost basis nor whether any amount of gift tax was paid on the stock Ms. Pree received. Agent Welch testified, however, that he believed the fair market value of the stock was zero.[10] On redirect, Agent Welch

---

[10] Ms. Pree's counsel engaged in the following cross-examination of Agent Welch on this issue:

> Q. Now, fair market value of the stock Bette sold was basically what somebody would pay for it, wouldn't you agree?

> A. When determining the fair market value of restricted stock on the day you receive, I would say the value is zero. You couldn't go across the street from the courthouse here, go into Merle Lynch [sic] and sell that stock because it is restricted, there's no market. There's no market selling that stock. So in my opinion it would be zero.

> Q. So that would be your opinion as to the fair market value as opposed to a taxpayer that may be interpreting that 551 of fair market value, is that correct?

> A. It would be the market value and there is no market. You would have to go out into a private sale and find someone and negotiate with them to come up with a price that they would pay. And that isn't in place when she receives the stock. You receive the stock, you can't go into the brokerage house across the street and sell it, you have to go out and find someone to sell it to. So on the day you receive that stock, the fair market—

> Q. The fair market value could be developed with the first sales transaction, don't you agree?

> A. Are we talking about a gift or for service?

> Q. I'm talking about the gift?

> A. Well, the gift has nothing to do with—

(continued...)

clarified that he relied on the Government's evidence that Ms. Pree received the stock as compensation for services rendered and explained why he treated the stock sales as income:

> Q. Now, you heard the testimony here when you chose to characterize the 60,000 dollars worth of stock sales in 1996 that weren't listed on Bette Pree's return, you characterized that as unreported income. Why is that?

> A. It wasn't reported on the return, it represents sale of stock, sale of stock goes on Line 13 as a capitol [sic] gain or loss. Actually a capitol [sic] gain. And that's income.

R.68 at 344. When asked to clarify why he attributed a zero basis to the stock, he explained:

> A. It was based on my 18 years of being with the I.R.S. and the [stock transfer agent] describing the restricted stock. And the fair market value of something I received is whatever the market value is. And right across the street is Merle Lynch [sic], when you walk out the door. If you receive stock that had value, you should be able to walk in there, into a brokerage house, and sell that stock. And from everything I've read and understand, this restricted stock could not be sold in the market.

R.68 at 345. Agent Welch also testified that the transfer agent said the stock had no market value.

At the close of the Government's case, Ms. Pree moved for an acquittal, in part on grounds that the Government had

---

[10] (...continued)

> Q. You are wanting to know what the fair market value is?

> A. I can just start over.

> Q. Probably a good idea. Actually, I think I'm done.

R.68 at 340-41.

presented no evidence of capital gains and had presented no evidence that Ms. Pree knew the law related to capital gains. The court denied the motion.

In defense, Ms. Pree presented evidence, including her own testimony, to support her position that the stock was received as a gift, that she never was employed by HCCA and that her records of the stock transactions were stolen, which caused a delay in her tax filing. Ms. Pree testified that she heard somewhere that the cost basis of her stock was a dollar and that she did not recall ever selling her stock for more than a dollar. She testified that she sold the stock to others to enable them to share in the investment opportunity.[11] She further testified that when she met with Westphal to prepare her 1995 and 1996 taxes, Westphal told her she did not need to file anything with regard to the stock sales because she always sold the stock for less than it was

---

[11] The following exchange occurred on cross-examination:

> Q. You testified that you use [sic] to check the price of stock before you sold it to investors, isn't that right?
>
> A. Sometimes.
>
> . . . .
>
> Q. Sometimes you would sell it without any regard at all to what the current market price was?
>
> A. Yes, I just—yes, I would want some people who maybe had no money or hard life or whatever to have some of this stock. And the money wasn't the main factor in it. The main thing was that in my heart I felt I wanted them to have some of it. And it wasn't to see how much money I could make off of my relatives and my friends.

R.69 at 617-18.

trading.[12] At the close of her case, Ms. Pree renewed her motion for judgment of acquittal, which the court denied.

### 2. Jury Instructions and Closing Arguments

Following the presentation of evidence, the court instructed the jury. The court did not give instructions regarding how to determine the total amount of taxable income, nor did it instruct the jury how to calculate basis in stock or net gains from the sale of stock. The defense did not request or offer any instructions on these issues, nor did it raise an objection on the ground that such an instruction should be given. With respect to the summaries, the court used the following pattern instruction:

> Certain summaries are in evidence. They truly and accurately summarize the contents of voluminous books,

---

[12] Ms. Pree testified:

> A. [Westphal] said that she looked at the information I had there and she said, well, you didn't make any money on this because you sold it for less than it was trading for, so really you have a loss there and you don't need to file it. And she—because I was—and she said, see that, she just wrote it up and she said see.
>
> She also said, you don't have to report a sale until a broker—or until the person has the certificate, until they have the certificate in their hand. And I said oh, because I didn't know.

R.69 at 558-59.

The district court later enhanced Ms. Pree's sentence on the ground of obstruction of justice for knowingly false testimony on a material matter based on her testimony related to her employment and Westphal's advice.

records or documents, and should be considered to-
gether with and in the same way as all other evidence in
the case.

R.39. The defense did not object to this instruction. Nor did
the defense raise a substantive objection to the elements of
the law instruction.[13]

In its closing and rebuttal arguments, the Government
emphasized that Ms. Pree was an employee of HCCA,
received the stock as compensation, sold the stock through-
out the tax years at issue, was repeatedly made aware of her
obligation to report the stock sales and yet took affirmative
and deceptive steps to avoid reporting that income. The
Government further challenged Ms. Pree's explanation of
the stock sales as a "favor" to let individuals "share this
investment," R.83 at 57-58, as well as Ms. Pree's explanation
of stolen records. The Government summarized its evidence
by emphasizing that the tax returns Ms. Pree filed for 1995
and 1996 willfully excluded the income Ms. Pree received
from her stock sales throughout the relevant time period.

Ms. Pree's counsel's closing argument primarily attacked
the Government's argument that Ms. Pree willfully misfiled.
Emphasizing the defense theory that Ms. Pree received the
stock as a gift, not as compensation, counsel argued that the
calculation of gift tax was too complicated for Ms. Pree
knowingly to have filed a false return.[14] Indeed, counsel

---

[13] The defense requested a minor clarification to reflect that the
instruction referred to Counts II and III of the indictment.

[14] Specifically, counsel made the following statement:

Why doesn't the prosecution want it to be a gift? Well, . . .
because you've seen how you tax gifts of stock. That's why.
(continued...)

suggested, Ms. Pree believed she had sustained a loss on the sale of her stock. Ms. Pree's counsel also argued that Ms. Pree had made good faith attempts to meet her filing obligations, but stolen and lost records inhibited her ability to comply. Counsel concluded the argument by urging:

> Neither Bette nor her tax preparers had an adequate knowledge of the law. Or even for that matter had sufficient records in order to satisfy the strict requirements of the law. That's not a crime if you had a good faith, honest belief that you were complying with your duty to file tax returns.

R.83 at 54.


### 3. Jury Verdict

Following deliberation, the jury convicted Ms. Pree of Counts II and III for willfully filing fraudulent returns for 1995 and 1996. At sentencing, the district court enhanced Ms. Pree's sentence on the ground of obstruction of justice for knowingly false testimony on a material matter based on her testimony related to her employment and Westphal's advice. Ms. Pree appeals the district court's denial of the judgment of acquittal on the ground of insufficient evidence. She also appeals the admission of the summary evidence and the adequacy of the jury instructions.

---

[14] (...continued)
> Nobody can figure that out. It better not be a gift or she lost. Because you've seen those I.R.S. tax publications and—Mr. Welch seemed to have a handle on it, but I bet none of you did.

R.83 at 44. Counsel then proceeded to review gift basis and the factors related to such a calculation.

## II

## DISCUSSION

### A. Sufficiency of the Evidence

We review first Ms. Pree's challenge to the sufficiency of the evidence. *See United States v. Douglas*, 874 F.2d 1145, 1150 (7th Cir. 1989), *abrogated on other grounds by United States v. Durrive*, 902 F.2d 1221 (7th Cir. 1990). Ms. Pree appeals the district court's denial of her motion for a judgment of acquittal. She submits that the Government presented insufficient evidence of unreported income, as well as insufficient evidence that she willfully misreported her income.

### 1. Standard of Review

The district court's denial of a judgment of acquittal is reviewed de novo. *See United States v. Sax*, 39 F.3d 1380, 1385 (7th Cir. 1994). The motion should be granted if "the evidence is insufficient to sustain a conviction." *Id.* (quoting 2 Charles A. Wright, *Federal Rules of Criminal Procedure* § 467, at 655 (1982)). A conviction is reversed only if, viewing the evidence in the light most favorable to the Government, no rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See id.*; *United States v. Chavin*, 316 F.3d 666, 672 (7th Cir. 2002). "A defendant has a heavy burden in challenging a conviction based on the sufficiency of the evidence." *United States v. Hoover*, 175 F.3d 564, 570 (7th Cir. 1999).

### 2. Sufficient Evidence of Unreported Income

Prosecution under 26 U.S.C. § 7206(1) requires that a taxpayer cause to be made and verify as true under penalties of perjury a tax return that the taxpayer knows is not

true and correct as to every material matter. *See* 26 U.S.C. § 7206(1); *see also United States v. Peters*, 153 F.3d 445, 461 (7th Cir. 1998). Ms. Pree was indicted for tax returns not true and correct as to Line 22, the line for total income on the United States Individual Income Tax Return (Form 1040).

The Government's evidence showed that Ms. Pree received $21,500 from stock sales in 1995 and $60,450 from stock sales in 1996. No portion of either amount was reported on the 1995 and 1996 tax returns. Ms. Pree contends, in this sufficiency challenge, that the Government did not establish that any portion of these amounts represented a *net gain*, and therefore did not establish that her income tax return was materially false as to total income.

Ms. Pree's argument is unavailing. It is true that the Government did not present evidence of technical valuations of the restricted stock. *See* Valuation of Securities Restricted from Immediate Resale, Rev. Rul. 77-287, 1977-2 C.B. 319, 321-22 (indicating that factors relevant to the valuation of restricted stock include the earnings, net assets, and net sales of the corporation, the resale provisions of the restricted stock, the relative bargaining strength of the buyers and sellers and the market experience of the corporation's freely tradeable securities), *as amplified by* Rev. Rul. 80-213, 1980-2 C.B. 101, *as amplified by* Rev. Rul. 83-120, 1983-2 C.B. 170. Nor, apparently, in cautious deference to Ms. Pree's motion in limine,[15] did the Government ask investors

---

[15] At one point in the trial, during a sidebar conference, the Government indicated that it was treating the motion in limine as precluding evidence of fraud:

> Your Honor . . . I believe the Defendant had sought in a motion in limine to keep out evidence of the fraud. And
> (continued...)

about the value of their purchases. Nevertheless, the evidence presented by the Government was sufficient to permit an inference that Ms. Pree sold her stock for a net gain in both 1995 and 1996.

Agent Welch testified that Ms. Pree possessed a zero basis in her stock and that the full amount of income received from stock sales should have been included as gross income on Line 22. He clarified this conclusion by explaining that Ms. Pree's basis in that stock was the fair market value of the stock when she received it. However, prior to Ms. Pree's sales, the stock had no readily ascertainable value because it was not publicly traded. By virtue of the restriction, the stock could not be sold in a public transaction. Thus, the only "market" for the stock was the one Ms. Pree created.

The evidence of Ms. Pree's sales permitted, but did not compel, the conclusion that the stock lacked ascertainable value outside the transactions she orchestrated. Despite the large number of shares that Ms. Pree sold, over 43,000 shares in 1995, and well over 150,000 shares in 1996, Ms. Pree testified that she never knew her basis and did not always check the value of the stock before selling it. Moreover, to the extent Ms. Pree or her investors checked the "value" of HCCA stock, that "value" pertained to publicly traded stock, not to the restricted stock sold by Ms. Pree. Additionally, the Government's evidence indicated that, after exhausting the initial block of shares transferred to her,

---

[15] (...continued)
    realistically what this opens the door to is that there is an enormous fraud by a number of people; and we have made great pains to keep it out; including the Defendant.

R.68 at 258. The court's grant of the motion in limine specifically prevented the Government from asking investors about their satisfaction with the HCCA stock.

Ms. Pree continued to "sell" stock months and even years before additional shares were registered in her name. Despite Ms. Pree's own statement to investors that the stock represented "the best investment you ever have made," Gov't Ex.15C, Ms. Pree herself apparently retained none of the initial 350,000 shares transferred to her. Under these circumstances, one plausible conclusion is that the stock lacked ascertainable value outside the transactions Ms. Pree engineered. *See* 26 C.F.R. § 1.1001-1(a) (indicating that "in rare and extraordinary cases" property may be considered to have no fair market value).

As we indicated previously, on a sufficiency challenge, we view the evidence in the light most favorable to the Government. In this respect, we note the absence of evidence in the record contradicting the Government's position that the restricted stock lacked ascertainable value prior to Ms. Pree's sales. Although on appeal Ms. Pree advances a valuation of the restricted stock based on factors such as net assets or net sales of the corporation, such evidence is not in the record and was not considered by the jury. Even accepting, arguendo, Ms. Pree's own theory of the stock as a "gift," we note that the record contained no evidence as to the valuation of her "gift basis" in the stock, i.e., evidence of Furlong's basis and any gift taxes paid at the time of transfer. In sum, the trial record will not support a method of valuation different from that employed by Agent Welch—that the full amount of stock sales should be included in income because Ms. Pree possessed a zero basis in the stock. Indeed, Ms. Pree attempted only to convince the jury through her own testimony that she sold all the stock in 1995 and 1996 at a loss or without a gain as a "favor" to her investors. R.69 at 609. The jury was entitled to reject that explanation. *See United States v. Agostino*, 132 F.3d 1183, 1193 (7th Cir. 1997) (reasoning that a rational jury could have found defendant's explanation not credible).

Finally, we think it is important to note that, to establish falsity as to the 1995 and 1996 returns, the Government needed only to prove that Ms. Pree had unreported income, not the exact amount of such unreported income or the existence of a tax deficiency. *See Peters*, 153 F.3d at 461 (indicating that the Government need not establish a tax deficiency in a prosecution under § 7206(1)). Based on the evidence presented, a rational jury could have determined that some portion of Ms. Pree's $21,500 stock sales receipts in 1995 and some portion of her $60,450 stock sales receipts in 1996 represented net gain and should have been included as income on the respective tax returns. Having reviewed the evidence presented at trial in the light most favorable to the Government, we must conclude that sufficient evidence of unreported income exists.

### 3. Sufficient Evidence of Willful Misfiling

Prosecution under § 7206(1) also requires that the defendant sign the return willfully, knowing it to be false. *See* 26 U.S.C. § 7206(1); *see also Peters*, 153 F.3d at 461. The evidence of willful misfiling is more than sufficient here.

The Government presented evidence that several individuals informed Ms. Pree of her obligation to report income from stock sales in the year such income was received and that Ms. Pree admitted understanding her obligation. In particular, Westphal testified that, following her purchase of stock from Ms. Pree and while preparing her 1995 and 1996 returns, she informed Ms. Pree of her obligation to report stock sales in the year the income was received. Westphal further testified that Ms. Pree failed to reveal any of the 1995 and 1996 stock sales at that time. Also, the IRS Special Agent who investigated Ms. Pree in 1996 testified that she asked Ms. Pree if she was aware that she needed to

report income from stock sales in the year the sale was made, and Ms. Pree responded that she was aware. Furthermore, Ms. Pree acknowledged her stock sales income in a self-serving forum—the declaration to the casino in which she indicated income in the amount of $80,000 from retirement, *stock sales* and social security.

Similarly, the jury was entitled to disbelieve Ms. Pree's testimony that she did not understand the law related to capital gains income. *See Agostino*, 132 F.3d at 1193 ("The jury . . . has the choice to disbelieve the defendant's testimony regarding [her] intent."). The Government's evidence—that Ms. Pree had been informed of her obligation to report income, that she had admitted understanding that obligation and that she acknowledged her stock sales income in another forum—is sufficient to support her convictions.[16]

---

[16] The Government also presented unrefuted evidence that Ms. Pree failed to report her gambling income from 1995 and under-reported her gambling income in 1996. Ms. Pree contends, however, that the Government's evidence that she *willfully* misreported this income is not sufficient.

We note that the W-2G forms are dated. Westphal testified that Ms. Pree presented her with W-2Gs for 1996 only. However, the amount reported for 1996, $3,662, corresponds with the W-2Gs for 1995. No combination of the amounts won in 1996 total $3,662. For these reasons, Ms. Pree contends that "the only logical explanation for the fact that Pree reported exactly $3,622 on her 1996 return instead of her 1995 return is that Westphal mistakenly entered the total gambling income for 1995 on the 1996 return and Pree did not catch her error." Appellant's Reply Br. at 8. Ms. Pree does not address, however, the unreported $7,800 of gambling income properly attributable to 1996.

We do not reach this issue. Having established that the jury could have concluded from the evidence presented that Ms. Pree

(continued...)

### B.  Admission of the Summary Evidence

At trial, Agent Welch testified as a summary witness for the Government. The Government also established his qualifications before the jury. During his testimony, Government Exhibit 101, summarizing Ms. Pree's stock sales during 1994, 1995 and 1996, and Government Exhibit 102, calculating Ms. Pree's 1994 gross income, were offered into evidence. Ms. Pree submits that the court improperly admitted Agent Welch's testimony because Agent Welch exceeded his role as a summary witness. Ms. Pree also argues that the errors in his testimony were compounded by the district court's failure to give a cautionary instruction regarding the summary evidence. At trial, counsel for Ms. Pree raised no objection either to Agent Welch's testimony or to the lack of a cautionary instruction regarding the summary evidence.

### 1.  Standard of Review

This court reviews for plain error the admission of evidence to which an objection was not made at trial. *United States v. Williams*, 133 F.3d 1048, 1051 (7th Cir. 1998); *see also United States v. Beall*, 970 F.2d 343, 347 (7th Cir. 1992) (indicating that review of admissibility of IRS agent's expert testimony would normally occur under abuse of discretion but reviewing under plain error standard for lack of an objection at trial). "[B]efore an appellate court can correct an error not raised at trial, there must be (1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights.' " *Johnson v. United States*, 520 U.S. 461, 466-67 (1997) (quoting *United*

[16] (...continued)
willfully failed to report income from stock sales in 1995 and 1996, we need not rely upon the gambling winnings as a basis for her conviction.

*States v. Olano*, 507 U.S. 725, 732 (1993)). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 467 (internal quotations and citations omitted). The defendant bears the burden of establishing that the error affected substantial rights, i.e., "that the outcome probably would have been different without the error." *United States v. Colvin*, 353 F.3d 569, 577 (7th Cir. 2003) (citing *Olano*, 507 U.S. at 734).

### 2. Agent Welch's Testimony

It is well-established that "[t]he nature of a summary witness' testimony requires that he draw conclusions from the evidence presented at trial." *United States v. Esser*, 520 F.2d 213, 218 (7th Cir. 1975). When a summary witness simply testifies as to what the Government's evidence shows, he does not testify as an expert witness. *See United States v. Swanquist*, 161 F.3d 1064, 1073 (7th Cir. 1998).

Ms. Pree's primary complaint with Agent Welch's testimony is that Agent Welch concluded from the evidence presented that Ms. Pree possessed a zero basis in her stock. We already have determined, however, that this was a permissible inference in light of the Government's evidence. That evidence showed that Ms. Pree received the stock as compensation, that the stock was restricted, which meant that it only could be sold in private transactions, and that its worth was limited to what Ms. Pree could obtain in the market she created. One plausible inference from the irregular nature of Ms. Pree's sales was that, prior to those transactions, the stock lacked ascertainable value. Accordingly, Agent Welch was entitled to treat Ms. Pree's basis as zero both in his testimony and in the summaries he

prepared. *See Esser*, 520 F.2d at 218 (noting that summary witness's testimony was properly admitted in a tax evasion case when the evidence was sufficient and the witness relied only on that evidence and was available for full cross-examination).

Ms. Pree contends, however, that Agent Welch exceeded his role as a summary witness and provided inadmissible expert testimony in the guise of a summary witness. We believe Agent Welch primarily testified within his role as a summary witness. However, we acknowledge that, in such a case as the present, where an IRS Revenue Agent summarizes the evidence for purposes of establishing the tax consequences, the line between summary testimony and expert testimony is indistinct. Given the assistance such an individual can provide to the jury, it has not been unusual in previous cases for an IRS agent to testify as an "expert summary witness." *See United States v. Moore*, 997 F.2d 55, 58 (5th Cir. 1993); *United States v. Mohney*, 949 F.2d 1397, 1406 (6th Cir. 1991); *United States v. Bosch*, 914 F.2d 1239, 1242 (9th Cir. 1990); *United States v. Dotson*, 817 F.2d 1127, 1132 (5th Cir.), *vacated in part on reh'g.*, 821 F.2d 1034 (5th Cir. 1987); *see also United States v. Benson*, 941 F.2d 598, 615 (7th Cir. 1991) (Kanne, J., dissenting) ("A summary witness need not necessarily be an expert, but experts in accounting and other disciplines regularly give summary evidence of the sort envisioned by Federal Rule of Evidence 1006." (citing 5 D. Louisell & C. Mueller, *Federal Evidence* § 599, at 540 (1981))), *mandate recalled and amended by* 957 F.2d 301 (7th Cir. 1992). "As a summary witness, an IRS agent may testify as to the agent's analysis of the transaction which may necessarily stem from the testimony of other witnesses. The agent may also explain his analysis of the facts based on his special expertise." *Moore*, 997 F.2d at 58. As an expert witness, an IRS agent's "opinion as to the proper tax

consequences of a transaction is admissible evidence." *United States v. Windfelder*, 790 F.2d 576, 581 (7th Cir. 1986). "Similarly, . . . an IRS expert's analysis of the transaction itself, which necessarily precedes his or her evaluation of the tax consequences, is also admissible evidence." *Id.*

Here, Agent Welch analyzed the stock sales and described the income tax consequences. Although he was not proffered as an expert witness, his qualifications were in evidence. Those qualifications included eighteen years of service with the IRS as a revenue agent, a bachelor's degree in accounting and a master's degree in taxation. While employed by the IRS, he completed additional classes in taxation, specialized training and continuing professional education. At the time of trial, he had conducted approximately two hundred tax audits and had reviewed several thousand audits of other revenue agents. Agent Welch was therefore qualified to express "an opinion as to the proper tax consequences of a transaction" and of the "transaction itself, which necessarily precedes his . . . evaluation of the tax consequences." *Id.* at 581.

Ms. Pree further contends that Agent Welch's testimony was inadmissible to the extent that he stepped into the role of an expert because he failed to use a recognized means of valuation of restricted stock. Agent Welch testified that the stock had no fair market value by virtue of the restriction because it could not be sold in a brokerage house. Admittedly, Agent Welch's statements to this effect were somewhat imprecise. Restricted stock does not lack value, per se, because it cannot be sold on the public market. *See* Rev. Rul. 77-287, 1977-2 C.B. at 321. Had Ms. Pree raised an objection to Agent Welch's testimony, on the ground that it constituted unreliable expert testimony, the district court would have undertaken the gatekeeping analysis Ms. Pree now recommends to this court. *See Daubert v. Merrell Dow Pharm.,*

*Inc.*, 509 U.S. 579 (1993); *see also United States v. Conn*, 297 F.3d 548, 557 (7th Cir. 2002) (indicating, in reference to a witness who was not proffered as an expert but testified in that role, that "[h]ad the defense had other concerns about the quality of [the agent's] training, the quantity of his experience, or the methodology that he employed in reaching his assessment of [the defendant's] firearms, it could have raised those questions during voir dire").

In the absence of an objection by Ms. Pree to Agent Welch's testimony as unreliable expert testimony, however, we do not perceive plain error. The conclusion that Ms. Pree's basis in the stock should be treated as zero was supported by sufficient evidence. Moreover, Ms. Pree's counsel had an opportunity to cross-examine Agent Welch as to his conclusions regarding the value of the stock. *See United States v. Gonzalez*, 933 F.2d 417, 429 (7th Cir. 1991) (indicating that "any questions or problems concerning the expert's opinion and testimony may be thoroughly explored during the cross-examination of the expert witness").

Ms. Pree also challenges Agent Welch's testimony as outside his area of expertise and improperly selective. We find no error on these grounds. First, Agent Welch's testimony did not fall outside his area of expertise in violation of our holding in *Benson*. In *Benson*, we held that an IRS agent's opinion as to whether the defendant was entitled to social security benefits was outside the agent's area of expertise and thus not admissible as expert testimony. *See id.* at 605. Unlike the testimony at issue in *Benson*, Agent Welch's testimony dealt directly with the tax consequences of Ms. Pree's stock sale transactions and the necessary underlying analysis of those transactions. *See Windfelder*, 790 F.2d at 581.

Second, Agent Welch did not make impermissible credibility determinations on the issue of whether Ms. Pree received the stock as a gift or as compensation. Rather,

Agent Welch permissibly relied upon the Government's abundant evidence that Ms. Pree received her stock as compensation. *See Moore*, 997 F.2d at 58 ("Perhaps, his testimony was selective but that is why cross examination is allowed."). Moreover, "[i]f a witness' expertise would be helpful to the jury, . . . and the facts which he recounts fall within his area of expertise, then there is nothing improper about a selective summary." *Id.* (internal citation omitted). Agent Welch possessed specialized knowledge of the tax consequences at issue and the evidence necessary to prove the indictment. The facts he recounted fell within his area of expertise. Thus, there was nothing improper as to his selective summary of the Government's evidence. It is true that, at one point, Agent Welch mistakenly testified that the transfer agent had said the stock had no value.[17] However, Ms. Pree's counsel had an adequate opportunity to conduct cross-examination following that testimony. Agent Welch's mistaken recollection does not create plain error in the admission of his testimony.

As a final response to Ms. Pree's various challenges to Agent Welch's testimony, we emphasize Ms. Pree's ample opportunity to cross-examine and to present her own evidence. Ms. Pree's counsel elicited from Agent Welch an explanation of capital gain as a net figure. Consistent with the defense theory, counsel then explored the computation of gift basis and capital gains and losses from the sale of

---

[17] The following exchange occurred:

> Q. [The stock transfer agent] testified here, did she not, that the stock had no market value, isn't that right?
>
> A. Yes, she did.

R.68 at 345. The transfer agent actually had testified that the value was limited to what could be received in a private transaction.

gifts with Agent Welch. Counsel also attempted to explore Agent Welch's conclusions as to the fair market value of the stock when Ms. Pree received it, but counsel then abandoned the cross-examination on this point. Ms. Pree also had an opportunity to present evidence as to her basis and to the proper valuation of the stock. Given these opportunities, we conclude that no plain error occurred in the district court's admission of Agent Welch's testimony. "[W]here, as here, the defense conducted a thorough cross examination of the witness concerning the disputed matters, and also had the opportunity to present its own version of those matters, the likelihood of any error in admitting summary evidence diminishes." *United States v. Norton*, 867 F.2d 1354, 1363 (11th Cir. 1989).

### 3. Summary Charts

Ms. Pree also challenges the admission of Government Exhibits 101 and 102 without a limiting instruction as plainly erroneous. Other courts have held that a cautionary instruction should be given when summary evidence is admitted. *See, e.g., United States v. Bishop*, 264 F.3d 535, 547 (5th Cir. 2001) (noting previously approved instructions that "summaries do not, of themselves, constitute evidence in the case but only purport to summarize the documented and detailed evidence already submitted," and a witness' summary "is not the evidence, the evidence is the documents themselves that he has been referring to"). We ourselves have indicated that, when summary charts are introduced into evidence as a teaching device rather than as substantive evidence, the " 'preferred practice' " is " 'to give a limiting instruction regarding this purpose.' " *United States v. Doerr*, 886 F.2d 944, 959 (7th Cir. 1989) (quoting *United States v. Howard*, 774 F.2d 838, 844 n.4 (7th Cir. 1985)).

No such instructions were given here; rather, a pattern instruction was given with regard to the summary evidence that stated that the summaries "truly and accurately summarize the content of voluminous books, records or documents, and should be considered together with and in the same way as all other evidence in the case." R.39. The Committee on Federal Criminal Jury Instructions for the Seventh Circuit advises that this instruction "should only be given when the accuracy and authenticity of the exhibits are not in question." Pattern Criminal Federal Jury Instructions for the Seventh Circuit 3.15 (1998). The accuracy of Government Exhibits 101 and 102 were not challenged at trial. Although the "preferred practice" with respect to summary evidence is to issue an appropriate cautionary instruction, under the circumstances here, the admission of the summary evidence without such a limiting instruction was not plain error. *See also Swanquist*, 161 F.3d at 1072-73 (indicating that the defendant had an opportunity during cross-examination to elicit facts suggesting the inaccuracy of summary charts and noting that a "party is not obligated . . . to include within its charts or summaries its opponent's version of the facts").

## C. Jury Instructions

Ms. Pree submits that the district court should have instructed the jury on the computation of capital gains income. She failed to request this instruction at trial, however. When a party neither requests an instruction nor objects to the court's failure to give it, this court reviews for plain error the failure to give the instruction. *See United States v. Gee*, 226 F.3d 885, 894 (7th Cir. 2000). "Reversal is proper only if the instructions as a whole are insufficient to inform the jury correctly of the applicable law and the jury is thereby misled." *United States v. Madoch*, 149 F.3d 596, 599 (7th Cir. 1998).

As a preliminary matter, we note the Government's argument that Ms. Pree waived, not merely forfeited, an objection to the jury instructions. A waiver is an " 'intentional relinquishment or abandonment of a known right' " and precludes appellate review. *United States v. Griffin*, 84 F.3d 912, 924 (7th Cir. 1996) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). Waiver extinguishes any error. *See id.* "A waiver's operative force depends upon the context in which it is made and its precise character." *Id.* "The right to object to jury instructions on appeal is waived if the record illustrates that the defendant approved of the instructions at issue." *Id.*

In *Griffin*, this court found that the defendant waived an objection to the given jury instruction because the defendants' counsel noted that the defendants "would prefer 53A," the instruction at issue on appeal. *Id.* In this case, Ms. Pree's counsel approved the instruction regarding the elements of the offense, suggesting a modification to clarify only which count of the indictment was involved. However, unlike the defendant in *Griffin*, Ms. Pree is not requesting plain error review of an instruction she previously approved. Rather, Ms. Pree is arguing that an instruction should have been given that she failed to request. Such circumstances do not present waiver but dictate plain error review. *See Gee*, 226 F.3d at 894.

Ms. Pree contends that the district court's failure to instruct on the computation of capital gains removed from the jury's consideration one of the elements of the offense, namely falsity as to a material matter. Falsity as to a material matter is an element of a 26 U.S.C. § 7206(1) prosecution. *See United States v. Peters*, 153 F.3d 445, 461 (7th Cir. 1998). "A false statement is 'material' when it has 'the potential for hindering the IRS's efforts to monitor and verify the tax liability' of the . . . taxpayer." *Id.* (quoting *United States v. Greenberg*, 735 F.2d 29, 32 (2d Cir. 1984)).

Although the district court did not instruct on the computation of capital gains income, it specifically did instruct the jury that it must find falsity as to a material matter: "To sustain the charge that the defendant willfully made and caused to be made a false individual income tax return as charged in Counts 2 and 3, the Government must prove the following propositions: . . . the income tax return was false as to a material matter, as charged in the count . . . ." R.39. The court also charged the jury as follows:

> A line on a tax return is a material matter if the information required to be reported on that line is capable of influencing the correct computation of the amount of tax liability of the individual or the verification of the accuracy of the return.

> If you find that the defendant willfully understated the amount of total income on her individual tax return, and if you find that the amount of gross receipts on a tax return is essential to a correct computation of the amount of taxable income or tax or to the verification of that return, then you may find that the false and fraudulent statements were false as to a material matter.

R.39.

These instructions were fully adequate as to the element of material falsity. The instructions together with the indictment required the jury to determine whether the amount of total income reported on Line 22 was false on the 1995 and 1996 tax returns. Line 22 is undoubtedly a material matter. Such instructions more than adequately encompass the element of material falsity. *Cf. United States v. Fernandez*, 282 F.3d 500, 509 (7th Cir. 2002) (declining to find plain error in jury instructions which did not include instruction on materiality but, viewed in their entirety, "encompassed the concept of materiality"). Both parties had ample opportu-

nity to argue how the facts of Ms. Pree's stock sales applied to the element of material falsity.

Additionally, the substantive direction that a capital gains instruction would have provided was already before the jury. Ms. Pree's counsel's cross-examination of Agent Welch clarified that income from the sale of stock was a net figure calculated from the seller's cost basis and the sales amount. The cross-examination highlighted the fact that Ms. Pree only was required to report net gain as income. Thus, the relevance of capital gain to the element of material falsity was presented to the jury.

As a final matter, we note that, in the closing argument, Ms. Pree's counsel chose to emphasize lack of proof that Ms. Pree willfully misreported her income, not absence of proof of capital gain. "When the jury instructions actually given 'as a whole treat a case fairly and accurately,' a defendant is not prejudiced by a district court's failure to give a particular instruction, and under such circumstances we will not disturb the jury instructions on appeal." *United States v. Manjarrez*, 258 F.3d 618, 626 (7th Cir. 2001) (quoting *United States v. Koster*, 163 F.3d 1008, 1011 (7th Cir. 1998)). The jury instructions given treated the case against Ms. Pree and her defense fairly and accurately. There was no plain error in the court's failure to sua sponte instruct on the calculation of capital gain.

## D. Sentencing

The district court determined Ms. Pree's sentence under the then-mandatory United States Sentencing Guidelines. The court found that the total amount of tax loss was $41,535.10, which resulted in a base offense level of 13. *See* U.S.S.G. § 2T4.1(H). The court added a two-level enhancement based on its finding that Ms. Pree had obstructed

justice. *See* U.S.S.G. § 3C1.1. A final offense level of 15 and a criminal history category of I resulted in a sentencing range of 18 to 24 months' imprisonment. The district court sentenced Ms. Pree to 18 months in prison. In addition, the district court ordered Ms. Pree to serve a one-year period of supervised release, with the special condition that she pay taxes owed to the IRS in the amount of $38,852.[18]

Ms. Pree did not challenge the constitutionality of her sentence before the district court or to this court in her original briefs on appeal. Nonetheless, in light of the sea change in federal sentencing law wrought by *United States v. Booker*, 125 S. Ct. 738 (2005), and this circuit's precedent prior to *Booker*, we believe it unfair to characterize Ms. Pree as having waived a challenge to the validity of her sentence. Therefore, we invited each party to submit a memorandum presenting its views regarding the application of *Booker* to this case, which they have done. In these circumstances, both parties submit that our review should be for plain error. We agree.

Under the plain error test, "before an appellate court can correct an error not raised at trial, there must be (1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights.' " *United States v. Cotton*, 535 U.S. 625, 631 (2002) (quoting *Johnson v. United States*, 520 U.S. 461, 466-67 (1997)). " 'If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4)

---

[18] The district court did not expressly cite to a source of authority for imposing this special condition of supervised release. However, it adopted the portion of the presentence report that had recommended the special condition as required by U.S.S.G. § 5E1.1(a)(2).

the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.' " *Id.* (quoting *Johnson*, 520 U.S. at 467).

The Government concedes that the district court committed error that was plain in treating the guidelines as mandatory and enhancing Ms. Pree's sentencing range based on the court's findings of fact. The Government submits, however, that Ms. Pree cannot show that the error affected her substantial rights because she cannot establish that she would have received a different sentence had the district court treated the guidelines as advisory, rather than mandatory. The Government also contends that Ms. Pree cannot show that the error seriously affected the fairness, integrity or public reputation of the judicial proceeding because judicial findings by a preponderance of the evidence are reliable and defendants have been sentenced under the guidelines for eighteen years with the approval of the federal courts. Moreover, the Government submits that Ms. Pree's sentence of 18 months fell within the 12 to 18 months sentencing range that would have applied had her offense level not been enhanced.

Ms. Pree, in turn, submits that, because she has completed her enhanced prison term, remand of that aspect of her sentence is not necessary. However, she contends that, in light of *Booker*, the district court plainly erred by ordering her to pay the IRS taxes amounting to $38,852 as a condition of her supervised release based solely upon the court's findings of fact. Ms. Pree requests that we vacate this condition of her supervised release and remand this case to the district court for reconsideration of the terms and

conditions of her supervised release.[19]

Ms. Pree's restitution obligation was imposed as a condition of her supervised release under the terms of the following sentencing guideline:

§ 5E1.1 Restitution

(a) In the case of an identifiable victim, the court shall—

. . . .

(2) impose a term of probation or supervised release with a condition requiring restitution for the full amount of the victim's loss, if the offense is not an offense for which restitution is authorized under 18 U.S.C. § 3663(a)(1) but otherwise meets the criteria for an order of restitution under that section.

U.S.S.G. § 5E1.1(a).

We explained in *United States v. George*, 403 F.3d 470 (7th Cir. 2005), that

the contention that *Booker* requires juries rather than judges to assess restitution is misguided. There is no "statutory maximum" for restitution; indeed, it is not a criminal punishment but instead is a civil remedy administered for convenience by courts that have entered criminal convictions, *see United States v. Bach*, 172 F.3d 520, 523 (7th Cir. 1999); *United States v. Newman*, 141 F.3d 531, 537-42 (7th Cir. 1998), so the sixth amendment does not apply. We have accordingly held that *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L.E.2d

---

[19] Ms. Pree additionally requests that we order the district court not to impose a term of supervised release that exceeds July 21, 2005, which is the date Ms. Pree would have completed her supervised release had her case not been stayed pending *Booker*.

435 (2000), does not affect restitution, *see United States v. Behrman*, 235 F.3d 1049, 1054 (7th Cir. 2000), and that conclusion is equally true for *Booker*.

*George*, 403 F.3d at 473.[20]

---

[20] *See also United States v. Rand*, 403 F.3d 489, 495 n.3 (7th Cir. 2005) (noting that, because restitution is civil in nature, and not criminal punishment, restitution orders are not governed by *Apprendi v. New Jersey*, 530 U.S. 466 (2000), or *United States v. Booker*, 125 S. Ct. 738 (2005)); *accord United States v. Garcia-Castillo*, No. 03-2166, 2005 WL 327698, at *5 (10th Cir. Feb. 11, 2005) (unpublished) (determining that *Booker* did not apply because restitution is not a criminal punishment and concluding that *United States v. Wooten*, 377 F.3d 1134, 1144-45 & n.1 (10th Cir. 2004), in which another panel of that court stated that courts commonly regard restitution as a criminal penalty but rejected challenge based on *Apprendi* and *Blakely v. Washington*, 124 S. Ct. 2531 (2004), because the restitution ordered did not exceed the value of the damaged property—the maximum allowed by statute—was not controlling because earlier circuit precedent clearly held that restitution is a criminal punishment).

Other courts of appeals also have held that *Apprendi* does not apply to orders of restitution. *See United States v. Ross*, 279 F.3d 600, 609-10 (8th Cir. 2002) (stating that restitution constitutes a criminal penalty and deciding that, even if *Apprendi* does apply to restitution orders, the amount of restitution ordered was valid because it fell under any statutory maximum); *United States v. Syme*, 276 F.3d 131, 159 (3d Cir. 2002) (holding, under the plain error standard of review, that although restitution ordered under 18 U.S.C. § 3663 is a criminal penalty, the *Apprendi* rule did not apply because the statute does not prescribe a statutory maximum amount); *United States v. Bearden*, 274 F.3d 1031, 1042 & n.4 (6th Cir. 2001) (noting that most courts have held that restitution is, at least in part, criminal punishment but holding that restitu-

(continued...)

However, *George* does not deal with the issue that confronts us here. We are not concerned here, as we were in *George*, with whether the particular requirements of restitution can be set by a judge or must be determined by a jury. Rather, here we are confronted with the antecedent question of whether restitution in any amount should have been imposed as a condition of supervised release. The sentencing court, realizing that its decision was not governed by any explicit statutory command, grounded its decision

---

[20] (...continued)

tion order did not conflict with *Apprendi* because it did not exceed the relevant statutory maximum).

However, we acknowledge that "[w]hether restitution is a criminal punishment and whether restitution is subject to *Apprendi*, *Blakely*, and *Booker* are by no means settled questions in courts across the country." *Garcia-Castillo*, 2005 WL 327698, at *5 n.4 (collecting cases); *see also United States v. McDaniel*, 398 F.3d 540, 554 n.12 (6th Cir. 2005) (noting, without expressing an opinion, that although courts generally have recognized that *Apprendi* did not render the Mandatory Victims Restitution Act unconstitutional, "there is some question as to whether *Booker* requires us to reconsider our analysis of criminal defendants' jury trial rights with respect to restitution orders"); *United States v. Trala*, 386 F.3d 536, 547 n.15 (3d Cir. 2004) (rejecting *Blakely* challenge to restitution order on the ground that the amount of restitution was not a disputed issue of fact); *United States v. DeSoto*, No. 04-12307, 2005 WL 901878, at *6 (11th Cir. Apr. 19, 2005) (unpublished) ("Because neither the Supreme Court nor this Circuit has addressed whether *Booker* applies to restitution, any error cannot be plain.").

In any event, none of these cases speak to the precise issue in this case: whether the district court erred by imposing restitution, in any amount, as a condition of supervised release under the guidelines.

solely in the sentencing guideline set forth earlier. Because the court acted prior to the advent of *Booker*, it believed that the guideline mandated the imposition of restitution on the condition of supervised release. Under our precedent, this misapprehension on the part of the trial court warrants our intervention. This is because our cases hold that the mandatory application of the guidelines itself, absent Sixth Amendment error, can amount to plain error in light of *Booker*. *See United States v. White*, No. 03-2875, 2005 WL 1023032, at *7 (7th Cir. May 3, 2005), *United States v. Schlifer*, 403 F.3d 849, 853 (7th Cir. 2005).

On this record we cannot be certain whether the district court would have imposed the condition of restitution upon Ms. Pree's supervised release had it understood the guidelines to be advisory, rather than mandatory. For that reason, we believe it appropriate, while retaining jurisdiction, to direct a limited remand in Ms. Pree's case for proceedings consistent with our circuit's recent decision in *Paladino*, 401 F.3d at 483-84. *See White*, slip op. at 13-15 (applying *Paladino*-limited remand due to mandatory application of the guidelines and noting that, with regard to the fourth prong of plain error, "we can and have predetermined that if the defendant has been prejudiced by an illegal sentence, then allowing that illegal sentence to stand would constitute a miscarriage of justice." (citing *Paladino*, 401 F.3d at 483; *United States v. Pawlinski*, 374 F.3d 536, 541 (7th Cir. 2004))).

## Conclusion

Accordingly, while retaining jurisdiction, we remand this case to the district court for proceedings consistent with this opinion and this court's decision in *Paladino*, 401 F.3d at 483-84.

IT IS SO ORDERED

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*