# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 05-1210

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

EDWARD BIRK,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 CR 31—**Amy St. Eve**, *Judge.*

ARGUED SEPTEMBER 12, 2005—DECIDED JULY 11, 2006

Before COFFEY, EASTERBROOK, and EVANS, *Circuit Judges.*

COFFEY, *Circuit Judge.* On August 24, 2004, a jury convicted Edward Birk on a charge of felon in possession of a firearm, *see* 18 U.S.C. § 922(g)(1), and the district court sentenced him to a term of imprisonment of 120 months followed by three years of supervised release. On appeal, Birk argues that he was denied a fair trial and due process of law when the government's witness testified that Birk had a "very violent and extensive" criminal background and that he was denied the effective assistance of counsel when his trial attorney failed to object to this testimony. Birk also claims that the district court erred in imposing a two level enhancement on his base offense level upon finding that the

offense and relevant conduct included Birk's involvement with four firearms. We affirm.

## I. Background

In December of 2003, the Chicago Police Department ("CPD") began investigating Dwayne Anderson for his involvement in the unlawful sale of firearms. While investigating Anderson, the CPD received information that led them to suspect that Edward Birk, a convicted felon, might also be involved. In January of 2004, the CPD and the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), with the assistance of a paid informant, Granville Payne, began investigating Birk. Officer Todd Gillerlain, a seven-year veteran of the CPD, instructed Payne to record any telephone calls from Birk on the stationary phone in his apartment using a recording device supplied by the ATF. Payne enlisted the help of his live-in girlfriend, Nancy Williams, to record any telephone conversations she received from Birk, known to her as "Ed," in the event he was not home.[1]

On January 7, 2004, Williams received two calls from an individual who identified himself as "Ed." As Payne requested, Williams recorded the two calls. During the first call, Williams and the caller discussed the sale of a shotgun:

Ed:        I'm calling to see if somebody, ah, you, know, gonna buy the shotgun.

Williams:  Yeah, he . . . . No he said his guy ain't want to buy it, ah, but he'll let you, ah, use his van to go hit the gun shop. But you got to

---

[1]  Throughout the trial transcripts, Edward Birk is referred to as both "Birk" and "Ed."

make sure that he get at least two of the guns out of it.

. . . .

Ed:            [D]ig this now, 'cause, ah, hey, somebody out here waiting on me. Just tell him to get somebody, sell, for the shotgun and I got him (unintelligible) hand things.

Williams:      Un huh.

. . . .

Ed:            Okay. After we got the gun, hey don't worry about these pistols.

Williams then told "Ed" to call back in fifteen minutes. During the second call, they agreed that the price would be $400, that the sale would be the following morning, and that "Ed" would obtain two pistols for Payne once he "hit the gun shop":

Ed:            You in there.

Williams:      Okay. But . . . . So his guys said he'll buy . . . .

Ed:            I got . . . . Look, I guarantee you two hand-guns after we hit the thing.

Williams:      Right. That's what . . . .

Ed:            This week. Do you hear me?

Williams:      Yeah, I'm listening.

Ed:            Okay.

Williams:      Okay.

Ed:            My word.

Williams:      Alright, so he . . . . This is what his guy said. His guy said that, uh, he'll buy the

shotgun from you in the morning but he don't want . . .

Ed:            (unintelligible)

Williams:    No bullshit. You listening?

Ed:            Okay. Yeah. Yeah.

Williams:    But he don't want no bullshit because you already got him with the six hundred on the 410.

Ed:            Okay, I gotcha. I gotcha.

Williams:    So Boo get up with you in the morning . . .[2]

Ed:            Okay.

Williams:    . . . with the four hundred dollars.

Ed:            Bet.

Williams:    That's what you want for it right?

Ed:            Yeah. Yeah.

Williams:    It's a 12 gauge right?

Ed:            Right.

Williams:    Okay, and make sure that you get the . . . give him the two pistols . . .

Ed:            Okay.

Williams:    After you hit the gun shop.

Ed:            Gotcha.

Williams:    Okay.

On January 8, 2004, CPD Officer Gillerlain equipped Payne and an undercover police officer with recording

---

[2] During trial, Payne was referred to as (a) Payne; (b) the confidential informant; (c) Boo; and (d) Mike.

devices and police money and instructed them to attempt to buy the shotgun from Birk; however, Birk failed to appear for the transaction and could not be contacted. The next day, Payne called Officer Gillerlain and told him that Birk was in Payne's apartment with a loaded shotgun and that he and Williams feared for their safety. Gillerlain and five other officers were dispatched to Payne's residence. En route, Gillerlain received an urgent call from Williams, inquiring as to how soon they would arrive. Gillerlain told Williams that their arrival was imminent and that they would confirm it by calling the apartment and letting the phone ring once. Upon the signal, Williams was to attempt to convince Birk to leave with the shotgun.

Once they arrived at the scene, the six officers positioned themselves at the bottom of the stairwell leading to Payne's apartment. Shortly thereafter, they heard someone leave the apartment and observed Birk descending the stairwell. Officer Gillerlain recognized the individual as Edward Birk and observed that he was carrying a gun which was protruding approximately one foot from underneath a bed sheet. As Birk started down the stairs, the officers announced their presence and ordered him to drop the gun. Birk immediately retreated up the stairs, but just as he re-entered Payne's residence, the police apprehended him and took possession of the shotgun.

Birk was arrested and charged with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).[3] The case proceeded to trial, with the parties

---

[3] On May 25, 2004, Birk was charged in a superceding indictment with two counts: (1) selling a firearm, namely, a Savage .410 shotgun, to a person while having reason to believe that such person had previously been convicted of a felony, and (2) being a felon in possession of a firearm, namely, one loaded Kessler Arms 16-gauge shotgun. On August 23, 2004, the first day of Birk's jury (continued...)

stipulating that the shotgun was a firearm that was transported in interstate commerce prior to January 9, 2004, and that Birk was a convicted felon. Officer Gillerlain identified Birk in open court, and he also testified that he recognized Birk's voice on the two tape recorded calls with Williams. Another arresting officer, Sergeant Loughran, testified that he read Birk his *Miranda* warnings and then transported Birk to the police station. According to Loughran, while they were en route to the station, Birk made the unprompted admission that he had been at Payne's residence to sell the shotgun for $250. Chris Labno, the ATF agent that interviewed Birk later that day in the lock-up, testified that Birk told him that he was going to sell the gun to Payne's cousin for $75. Labno recounted that Birk admitted to possessing a shotgun when arrested, that he was carrying the gun to Payne's van at the time of his arrest, and that after he saw the officers, he fled back into Payne's apartment, where he threw the gun onto the floor just as he was apprehended. At trial, the tape and transcripts of the calls between Birk and Williams were introduced, and Officer Gillerlain, Agent Labno, and Williams all identified the male voice on the tape as Birk's.

During trial, the government broached the issue of Birk's prior convictions with Officer Gillerlain, who stated that he learned Birk was a convicted felon by searching law enforcement databases. Prior to this testimony, the district court gave the following limiting instruction to the jury: "*Ladies and gentlemen, you are about to hear testimony that is not being offered for the truth of the matter. So, it is not being offered for the truth of what this individual is about to tell you. It is being offered for the limited purpose to show you why he took certain actions*." Later in his testimony, the

---

[3] (...continued)
trial, the government moved to dismiss the sales charge and proceeded to trial only on the possession charge.

prosecutor asked Officer Gillerlain if he knew of Birk's criminal history when he saw him exiting Payne's apartment with the shotgun, to which Officer Gillerain responded, "I knew that the criminal history of that individual was very violent and extensive." The prosecutor then asked, "You had knowledge that he was a convicted felon at that time?" Gillerlain responded, "Correct. Correct." Birk's trial counsel did not object to this line of questioning.

On August 24, 2004, after a two-day trial, the jury convicted Birk of the felon in possession charge. On September 17, 2004, Birk moved the district court for permission to discharge his trial counsel, who had been appointed at the time the complaint against Birk was filed. Thereafter, on September 30, 2004, the court granted his motion and appointed another attorney, who currently serves as Birk's appellate counsel. On January 19, 2005, Birk was sentenced to a term of imprisonment of 120 months to be followed by three years of supervised release. At sentencing, the district court determined that Birk's offense and related conduct involved four firearms and enhanced Birk's base offense level two points pursuant to U.S.S.G. § 2K2.1(b)(1)(A). The court found the enhancement appropriate because ". . . the offense and related conduct involved at least four firearms; namely, the Kessler Arms 16-gauge shotgun, which the defendant had when he was arrested; the .410 shotgun that the defendant sold to the cooperating individual through co-defendant Anderson; and, the two promised handguns that the defendant was supposed to sell to the cooperating individual."

## II. ISSUES

On appeal, Birk argues that he was denied a fair trial and due process of law when the government's witness informed the jury that Birk had a "very violent and extensive" criminal background, that he was denied the effec-

tive assistance of counsel based on his trial attorney's failure to object to the testimony of the government witness that Birk had a "very violent and extensive" criminal background, and that the district court erred in imposing a two level enhancement on Birk's base offense level under U.S.S.G. § 2K2.1(b)(1)(A) upon finding that the offense and relevant conduct included Birk's involvement with four firearms.

## III.  DISCUSSION

### A.  Admissibility of the Nature of Birk's Prior Felony

Since Birk's counsel did not object to the admission of Officer Gillerlain's testimony at trial, the admission of such testimony is reviewed for plain error. Fed. R. Crim. P. 52(b); *United States v. Pree*, 408 F.3d 855, 868 (7th Cir. 2005). Under the plain error standard, before an appellate court can correct an error not raised at trial, there must be "(1) an 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights.'" *United States v. Cotton*, 535 U.S. 625, 631 (2002); *see also United States v. Henningsen*, 402 F.3d 748, 750 (7th Cir. 2005). If all three requirements are met, an appellate court may review a forfeited error, "but only if [ ] the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Cotton*, 535 U.S. at 631-32; *see also Henningsen*, 402 F.3d at 750. The defendant bears the burden of proving that an error affected his substantial rights and may do so by establishing that "the outcome [of the trial] would have been different without the error." *Pree*, 408 F.3d at 869. In other words, Birk must demonstrate that the trier of fact decided his fate based not on the circumstances of the charged offense, but upon the fact that he was a violent career criminal.

In order to prove its case against Birk, the government needed to establish that: (1) on January 9, 2004, Birk knowingly possessed a firearm; (2) he had a prior felony

conviction; and (3) the firearm possessed by Birk had traveled in interstate commerce prior to Birk's possession of the shotgun. *See* 18 U.S.C. § 922(g)(1); *United States v. Morris*, 349 F.3d 1009, 1013 (7th Cir. 2003). Birk stipulated to the latter two elements, thus the only issue at trial was whether Birk knowingly possessed a firearm on January 9, 2004. On that issue, the government presented a plethora of evidence. Officers Gillerlain and Loughran testified that they witnessed Birk exiting Payne's apartment holding a gun, fleeing from police officers once their presence was announced, and then throwing the gun to the floor in Payne's apartment while being apprehended by the officers. The government also introduced testimony regarding Birk's confessions to law enforcement officers, on two occasions, that he was holding a gun or involved in trying to sell one on the date in question. Specifically, Sergeant Loughran testified that after Birk was read his *Miranda* warnings, Birk made an unprompted admission that he had been at Payne's residence to sell the shotgun to an acquaintance's brother for $250. Additionally, ATF Agent Labno testified that after he advised Birk of his *Miranda* warnings, Birk admitted that (1) he was carrying a gun to Payne's van just prior to his arrest, (2) he planned to sell the gun to Payne's cousin, (3) he would receive $75 for selling the gun to Payne's cousin, (4) he fled from the officers when they announced their presence, and (5) he threw the gun just as he was being apprehended by the police. Furthermore, the jurors heard the recordings and transcripts of the calls from January 7, 2004, in which Birk explicitly discussed the sale of a shotgun as well as an agreement to obtain two hand-guns for Payne in exchange for facilitating the sale of the shotgun. The jury also presented with Williams' in-court identification of Birk, based on his voice, as the caller on January 7, 2004, and the man in Payne's apartment on January 9, 2004.

As conceded by the government, the admission into evidence of Officer Gillerlain's testimony that Birk's

criminal history was "very violent and extensive" clearly constituted plain error. However, when the evidence is so strong and convincing that a jury would have reached the same verdict absent the error, then the error is harmless. *See United States v. Ramsey*, 406 F.3d 426, 432 (7th Cir. 2005). Based on the overwhelming evidence detailed above, which demonstrated Birk's knowing possession of a firearm, we are convinced that the district court's error did not seriously affect Birk's substantial rights or "the fairness, integrity, or public reputation of judicial proceedings." *Id.*; *see also United States v. Daniel*, 134 F.3d 1259, 1262-63 (6th Cir. 1998) (holding that admission of the nature of defendant's prior criminal history was harmless due to overwhelming evidence against defendant), *cert. denied*, 525 U.S. 830 (1998). Rather, we are of the opinion that the record conclusively demonstrates that the government presented more than sufficient evidence to satisfy the elements of a felon in possession charge. *See United States v. Johnson*, 137 F.3d 970, 975 (7th Cir. 1998). We have no doubt that the jury would have rendered the same verdict in this case had Officer Gillerlain never mentioned the violent nature of Birk's prior criminal convictions or had the trial judge stricken that remark. Thus, we hold that the district court's error in admitting the evidence was harmless.

## B.  Ineffective Assistance of Counsel

Birk also argues that he was denied the effective assistance of counsel because his trial attorney failed to object to Officer Gillerlain's testimony that he had a "very violent and extensive" criminal background. In order to sustain an ineffective assistance of counsel claim, a defendant must prove that his attorney's performance fell below an objective standard of reasonableness *and* that he was prejudiced as a result. *See Strickland v. Washington*, 466 U.S. 668, 687-88

(1984). Furthermore, in *Strickland,* the Supreme Court stated that "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies," and concluded that where an ineffective assistance claim may be resolved based on lack of sufficient prejudice, "that course should be followed." *Id.* at 697; *see also Taylor v. Bradley*, 2006 WL 1376958, at \*6 (7th Cir. 2006) (citing *Strickland* and finding that "[t]his court has consistently followed the Supreme Court's mandate in *Strickland,* first examining whether the petitioner has established prejudice and then, if necessary, examining whether counsel's performance fell outside the parameters of what could objectively be considered 'professionally competent.'").

In light of the overwhelming evidence against him and from our review of the record, we are convinced that Birk has failed to demonstrate how the outcome of his trial would have been different if the jury had not heard Officer Gillerlain's remark about the nature of his prior convictions. As previously set forth in detail, the government presented more than sufficient evidence of Birk's knowing possession and control of a shotgun on January 9, 2004. Thus, his trial attorney's failure to object to the admission of Officer Gillerlain's testimony did not prejudice Birk, and his ineffective assistance of counsel claim falls short. *See also Bieghler v. McBride*, 389 F.3d 701, 707 (7th Cir. 2004) (holding that ineffective assistance of trial counsel did not prejudice the case where there was overwhelming evidence and "damning testimony" against the defendant).

## C.  *Sentence Enhancements*

Birk's final argument is that the district court's imposition of a two level enhancement to his base offense level pursuant to U.S.S.G. §2K2.1(b)(1)(A) constituted clear error. Specifically, Birk contends that the district court errone-

ously found that his offense involved the .410 shotgun he sold to Payne through Anderson and the two handguns he promised to obtain for Payne. The district court's factual determinations related to sentencing are reviewed only for clear error. *United States v. Griffin*, 310 F.3d 1017, 1022 (7th Cir. 2002). "Furthermore, a district court's choice between two permissible inferences from the evidence cannot be clearly erroneous." *United States v. Wyatt*, 102 F.3d 241, 246 (7th Cir. 1996). Rather, a factual determination is clearly erroneous "only, if after considering all the evidence, the reviewing court is left with the definite and firm conviction that a mistake has been committed." *United States v. Messino*, 55 F.3d 1241, 1247 (7th Cir. 1995) (internal quotations omitted).

Pursuant to the now-advisory United States Sentencing Guidelines, *see United States v. Booker*, 543 U.S. 220 (2005), U.S.S.G. §2K2.1(b)(1)(A) provides for a two level increase in the defendant's base offense level if an offense involved three or more firearms. The commentary to U.S.S.G. §2K2.1(b)(1)(A) provides that the district court should "count only those firearms that were unlawfully sought to be obtained, unlawfully possessed, or unlawfully distributed." U.S.S.G. § 2K2.1, cmt., n. 2. It is the government's burden to prove by a preponderance of the evidence the number of firearms involved in an offense, and the sentencing court may consider relevant evidence regardless of whether such evidence is admissible under the Federal Rules of Evidence "so long as the information . . . has a sufficient indicia of reliability to support its probable accuracy." *United States v. Edwards*, 115 F.3d 1322, 1326-27 (7th Cir. 1997).

The district court found that the offense and relevant conduct involved at least four firearms: (1) the Kessler Arms 16-gauge shotgun, for which Birk was convicted; (2) a .410 shotgun that Birk sold to Payne through Anderson, which was charged in Count Two of the indictment but later

dismissed; and (3) the two handguns that Birk discussed with Nancy Williams and intended to sell to Payne at some later date, but did not possess at the time of his arrest. We need only address the two handguns Birk promised to obtain for Payne in exchange for facilitating the sale of the shotgun. If they are properly included in the calculation, then the magic number three is reached and the enhancement was appropriate; if they cannot be counted, then a remand for resentencing would be warranted.

The Guideline commentary states that a court should consider those firearms "unlawfully sought to be obtained" when determining whether an enhancement is appropriate. U.S.S.G. § 2K2.1, cmt., n. 1. At sentencing, the government introduced into evidence both of the recorded conversations between Birk and Williams that occurred on January 7, 2004. The first conversation begins with Birk referencing the shotgun at issue in this conviction: "I'm calling to see if somebody, ah, you, know, gonna buy the shotgun." Williams, in turn, counters with, "Yeah, he . . . . No he said his guy ain't want to buy it, ah, but he'll let you, ah, use his van to go hit the gun shop. But you got to make sure that he get *at least two of the guns out of it*." In the second conversation, Birk states, "I guarantee you two handguns after we hit the thing." Then, at the end of the second conversation, Williams says, "[M]ake sure that you get the . . . give him the two pistols," to which Birk replies, "Okay."

The dialogue between Birk and Williams demonstrates an understanding that not only was the shotgun at issue but that the two handguns were also part of the deal. While the Guidelines caution against speculative findings, they also "emphasize the need to consider intended conduct as well as completed conduct." *United States v. Szakacs*, 212 F.3d 344, 348 (7th Cir. 2000). Although the guns were not yet in Birk's possession, he did offer specific information about the guns he promised to obtain for Payne in exchange for facilitating the sale of the shotgun, namely, the number of

guns (two) and the type of guns ("handguns" or "pistols") to be bartered. Furthermore, as previously discussed, there was ample evidence offered at trial that Birk was the individual on the phone bartering with Williams. Thus, because there is more than a sufficient quantum of evidence in the record to support the district court judge's finding that the two pistols formed part of the consideration for the sale of the shotgun Birk was ultimately charged with possessing, we affirm Birk's sentence, including the two level enhancement to Birk's base offense level upon finding that the offense and relevant conduct included Birk's involvement with three or more firearms.

## III.  Conclusion

The court AFFIRMS Birk's conviction and sentence.

No. 05-1210                                                    15

A true Copy:

    Teste:


                           _____
                           *Clerk of the United States Court of*
                           *Appeals for the Seventh Circuit*