In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-4668

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

TOMAS ORTIZ,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 CR 714—**Elaine E. Bucklo**, *Judge.*

ARGUED NOVEMBER 8, 2006—DECIDED JANUARY 31, 2007

Before CUDAHY, KANNE, and SYKES, *Circuit Judges.*

CUDAHY, *Circuit Judge.* Tomas Ortiz was found guilty, as a convicted felon, of possessing of a firearm in violation of 18 U.S.C. § 922(g)(1). He appeals, arguing both that § 922(g)(1) is unconstitutional and that the district court erred by admitting two pieces of evidence at his trial: testimony that Tomas and a government informant had together robbed a drug dealer six years earlier and a videotape showing Tomas preparing marijuana for sale. Because any error was harmless, we affirm.

The evidence that convicted Tomas Ortiz was primarily the testimony of FBI informant William Ortiz and recordings he made under FBI supervision. William and Tomas

are both members of the Latin Kings street gang—William was "Inca" or leader of the gang's Whipple and Wabansia chapters—but they share no familial relation. (Nonetheless, due to their identical surnames, we will refer to the pair by their first names.)

In 2003, the FBI offered to get William a reduced sentence on a drug charge if he would help the Bureau obtain evidence against other Latin Kings. William accepted the offer and aided several investigations of Latin Kings of the Whipple, Wabansia and Spaulding chapters. He purchased drugs and weapons from the targets, surreptitiously recorded their acts and conversations and testified against them.

William's first FBI-sponsored interaction with Tomas was a series of failed drug buys in late 1993 and early 1994. William told his handlers that he could purchase drugs or weapons from Tomas. With FBI approval and buy money, he met Tomas on October 19, 2003 and on January 23, 29 and 30, 2004. Each time William intended to purchase crack from Tomas, but each time he returned to his handlers with buy money intact and with no incriminating evidence.

In February, the FBI and William changed tactics and sought to have William obtain a gun from Tomas, who as a convicted felon could not legally possess a gun. They had reason to believe that Tomas had a gun, in fact, that he had two. In a conversation the FBI recorded on January 23, Tomas described a time he tried to confront members of a rival gang, the Maniac Latin Disciples:

> Tomas:   We came over here and shit. These niggas like, "Man Papo, there's like five cars of Maniacs over here. Yo, what the fuck?" I came out with two thangs. "Where them bitches at." (laughing)

William: Uh huh. They were gone?

Tomas: Yeah, yeah, they was gone. Got a big-ass Ruger. A Ruger . . . a .22 Ruger and a .380.

(Government Ex. 2 at 2.)

The FBI's plan reached fruition on February 11, 2004. That day, William called Tomas three times. FBI Agent James McDonald recorded the third call, in which William asked Tomas, "You let me use one of your toys? To do somethin'?" (Government Ex. 8 at 1.) William later testified that by "toys" he meant "guns" and that "do somethin[g]" meant "rob a drug dealer." Tomas agreed to meet William in twenty minutes and hung up.

FBI Agents outfitted William with audio and video recording equipment, gave him buy money and sent him to Tomas's house in his 1987 conversion van. One set of FBI agents followed William. Another set waited at Tomas's house and recorded from a second vantage point as William entered the house and conversed with Tomas. At one point, the following exchange occurred (bracketed segments are in Spanish, translated by William):

William: Which one you got?

Tomas: Uh, the two two.

William: The two. You got, you got, you got a round in it?

Tomas: Huh?

William: You got a round?

Tomas: Yeah.

William: Cool. . . .

Tomas: What is it? One of them thangs?

William: Huh, yeah, probably two.

Tomas:      Two what? Bricks?

William:  Two bricks.

Tomas:      Huh?

William:  [They invited me.] I guess I'll give you half, you know. [For loaning it to me, you know.]

Tomas:      Don't trip.

William:  You know.

Tomas:      You know how we do this.

(Government Ex. 10 at 7.)

William later testified that a "brick" was a brick of cocaine, about one kilogram, and that at the time he believed the "two two" was the .22 caliber Ruger Tomas had mentioned on January 23. (R. 71 at 177-78.)

Tomas and William then left the house and got into William's van to drive to North Avenue and Albany, where Tomas said "it[ ]" was at. (Government Ex. 10 at 8.) William drove and Tomas rode in the passenger seat; Tomas's brother followed in a car. One set of FBI agents followed, but the other stayed back. On the way, Tomas and William continued to discuss the weapon. William asked if Tomas had only "one pistol." Tomas responded that he "could probably get another one." (Id.) Tomas said he didn't intend to sell "it" to William but that William would "fall in love with it," and that it "look like it got a silencer on it." (Id. at 9.)

When they arrived at North and Albany, Tomas went into a house and returned about a minute later. (At this time, William's FBI tails left, fearing that they had been spotted as law enforcement.) William testified that Tomas brought back a gun and showed it to him. The gun does not appear on the videotape, but Tomas and William were recorded discussing it in detail:

> William: Lemme see it. [Let me see that.] Damn.
>
> Tomas: They look at that, that look like a silencer.
>
> William: Huh?
>
> Tomas: There ain't nothing in the thing. You pull it back here you know . . . [unintelligible]
>
> William: Ah, that's like a German pistol.
>
> Tomas: Yeah. . . . Shit, more will fit in that bitch too.
>
> William: How many shots is it?
>
> Tomas: Like thirteen.

(*Id.* at 13.)

The FBI taped the entire conversation, during which Tomas continued to discuss the gun. William asked to whom it belonged, to which Tomas responded, "This pistol? This my cousin's shit." (*Id.* at 14.) Tomas reiterated that his cousin would be unwilling to sell the gun but stated that his cousin "can get us a whole bunch of pistols, dog. He had crates, in the summer we had crates of guns." (*Id.*)

William dropped Tomas off at the intersection of Division and Homan, where Tomas's brother picked him up. William testified that when Tomas left the car, he put the gun under a newspaper between the passenger's and the driver's seats; this is consistent with the tape, in which Tomas says, "It's under here. . . . It's right under here," just before leaving the car. (*Id.* at 17.) Then William drove to a prearranged location to rendezvous with his FBI handlers. They searched the car and recovered a .22 caliber Sturm Ruger pistol. The next day, William called Tomas to tell him a cover story, that he had lost the pistol when the planned robbery was foiled by police.

Tomas was charged with violating 18 U.S.C. § 922(g)(1), which makes it "unlawful for any person . . . who has been

convicted in any court of, [sic] a crime punishable by imprisonment for a term exceeding one year . . . to . . . possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." The government presented the recordings, William's testimony and the testimony of several law enforcement agents (including Bureau of Alcohol, Tobacco and Firearms Special Agent Michael Casey, who identified the gun's make and opined that it had crossed state lines in moving from Sturm Ruger's factory in Connecticut to Illinois). Tomas was convicted.

Tomas now appeals on two grounds. First, he argues that Congress lacks power under the Commerce Clause to enact § 922(g)(1). This argument is clearly foreclosed by controlling precedent. *See, e.g.*, *Untied States v. Sidwell*, 440 F.3d 865, 870 (7th Cir.), *cert. denied*, 127 S. Ct. 137 (2006); *United States v. Bell*, 70 F.3d 495, 498 (7th Cir. 1995). Tomas explains that he advances the argument only to preserve it for possible Supreme Court review, and we will discuss it no further.

Second, Tomas argues that his conviction was tainted by the improper admission of two pieces of evidence during the prosecution's redirect examination of William: testimony concerning an earlier drug robbery and a videotape of Tomas preparing marijuana for sale. This evidence allegedly violated the Rule 404(b) ban on using evidence of other crimes to show action in conformity with character and had a prejudicial effect that substantially outweighed its probative value in violation of Rule 403. "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes." Fed. R. Evid. 404(b). In order to offer evidence of past crimes or acts for "other purposes," the prosecution must show that the evidence

establishes a matter in issue other than the defendant's propensity to commit the charged crime, that the act is similar enough and sufficiently close in time to be relevant to the matter in issue, that the evidence of the past crime or act is sufficient to support a jury verdict that the crime or act occurred and that the evidence has probative value not substantially outweighed by its prejudicial effect. *United States v. Leahy*, 464 F.3d 773, 797 (7th Cir. 2006), *quoting United States v. Anifowoshe*, 307 F.3d 643, 646 (7th Cir. 2002); *United States v. Chaimson*, 760 F.2d 798, 804 (7th Cir. 1985). We review the district court's application of this test for abuse of discretion. *Leahy*, 464 F.3d at 797; *Anifowoshe*, 307 F.3d at 658.

The robbery evidence was presented for a reason other than showing action in conformity with character, namely to show the meaning of the terms in William and Tomas's conversations on February 11 and February 12; however, the probative value of the evidence is not impressive. During William's cross examination, defense counsel emphasized that William had never asked for a gun by name or used "any word like stick-up, robbery, [or] rip-off" in his February 11 and February 12 telephone calls, but had instead referred obliquely to "toys" and "do[ing] somethin[g]." The implication was that Tomas might have understood William to be talking about something other than armed robbery. On redirect, the government questioned William about a time in 1998 when William, Tomas and other Latin Kings robbed a drug dealer.

The government argued that the prior robbery showed that William and Tomas might have had a private code or slang for drug robberies: "The reason why they don't use the term 'stick up' . . . is because they know, they both know what they're going to do because they've done it before." (R. 26 at 250.) This is a relevant issue distinct from any propensity of Tomas to commit armed robberies.

It is often relevant whether a criminal defendant understood a conversation, and courts can sometimes properly admit other-crimes evidence offered to show a defendant's familiarity with certain unusual linguistic usage, for example, in drug prosecutions where the traffickers deliberately use code to hide their transactions from potential surveillance. *See, e.g.*, *United States v. Morgan*, 354 F.3d 621, 622-23 (7th Cir. 2003) (upholding the admission of other-crime evidence, including evidence containing code phrases in drug transactions, to show that a drug courier acted as agent for the defendant); *United States v. Harris*, 271 F.3d 690, 705 (7th Cir. 2001) (upholding the admission of testimony about uncharged prior drug deals where the evidence helped explain, among other things, the defendant's use of code). But William only testified that a robbery had occurred, not that the perpetrators had used code such as "toy" or "something" in connection with it. Even assuming that Tomas used code or slang in 1998, it requires another leap to conclude that he would quickly pick up on the same terminology six years later, having for all we know never used a similar expression in the interim. *Cf. United States v. Garcia*, 291 F.3d 127, 138 (2d Cir. 2002) (holding that testimony of a prior cocaine conviction twelve years in the past was not "meaningfully probative" as to whether the defendant understood a drug conversation when "[t]here was no proffer that the earlier transaction used a code or involved the same people").

Tomas also objected to a videotape recorded on January 23, 2004, that shows him preparing marijuana for sale. While cross-examining William, the defense counsel established that William told the FBI that he could purchase drugs from Tomas but repeatedly failed to do so. William admitted that in February 2004 he knew that he "had to deliver results for [the FBI] to get [his sentencing] deal," that he knew the FBI was getting ready

to charge him and that he came up with the idea of obtaining a gun from Tomas to "help [him]self." (R. 27 at 238-39.) In apparent response, the government on redirect elicited testimony that Tomas had told William he was selling "China white" (i.e., heroin) (R. 27 at 247), and the government introduced a video showing Tomas preparing and sealing "dime bags" of marijuana (Government Ex. 18, R. 27 at 267-71). Tomas objected only to the video.

The district court admitted the tape on the ground that defense counsel had put Tomas's drug habits in issue by suggesting that William had lied about those habits to the FBI. (*See, e.g.*, R. 27 at 258 ("If the issue is did you ever sell drugs . . . we have the defendant on screen rolling.").) But while a jury *could* have concluded that William lied to the FBI, the defense counsel's argument focused instead on the distinct issue of whether William's FBI deal gave him an incentive to frame Tomas, especially in light of his early failures to hold up his end of the bargain. This was impeachment though a showing of personal interest in incriminating Tomas, not a showing of dishonesty, and whether Tomas actually sold drugs was not directly relevant. Even if William had been completely honest with the FBI, he might have worried that the FBI thought he was a liar when he was unable to buy drugs, or he simply might have thought his FBI deal would fall through in the absence of some incriminating evidence.

Whether the testimony and video were admissible under the somewhat convoluted theories presented by the government is a close question. However, we need not resolve this question, because the admission of the evidence objected to could not possibly have caused Tomas's conviction. Errors do not merit reversal when the government proves that they are harmless, that is, that they did not affect the outcome of the trial. Fed. R. Crim. P. 52(a); *United States v. Thomas*, 321 F.3d 627, 635 (7th Cir.

2003) (holding that the burden is on the government to show that the error did not affect the outcome of the proceedings); *see also Alvarez v. Boyd*, 225 F.3d 820, 825 (7th Cir. 2000) (addressing "cumulative error"). Courts have sometimes tried to describe that burden in a different way in the case of a jury trial, saying, for example, that the government must show that the prosecution's case would not have been significantly less persuasive to the average juror if the improper evidence had been excluded. *United States v. Owens*, 424 F.3d 649, 656 (7th Cir. 2005). However, the basic idea is the same: we must be convinced that the jury would have convicted even absent the error.

Here we have no doubt that the jury would have convicted without the robbery testimony and video. There are three elements to a § 922(g)(1) violation: the prior felony, the possession of the gun and the gun's travel in interstate commerce (i.e., across state lines) prior to the defendant's possession of it. *United States v. Birk*, 453 F.3d 893, 897 (7th Cir. 2006); *United States v. Hodges*, 315 F.3d 794, 799 (7th Cir. 2003); *see also United States v. Lewis*, 100 F.3d 49, 52 (7th Cir. 1996) (holding that movement of a gun across state lines grants Congress power to regulate its possession under the Commerce Clause). Tomas stipulated that he had committed a felony, and the evidence of his handgun possession can properly be described as overwhelming. *See Birk*, 453 F.3d at 898 (concluding that error in admitting testimony of a defendant's past crimes was harmless in light of "overwhelming evidence" demonstrating his possession of a gun in violation of § 922(g)(1)); *United States v. Brown*, 328 F.3d 352, 358 n.6 (7th Cir. 2003). In William's van, Tomas was recorded repeatedly using demonstratives that make no sense absent a weapon to demonstrate, referring to "this pistol" and to "that" shape which "look[s] like a silencer." At one point he even indicated that he was operating part of the

gun's mechanism, saying "you pull it back here, you know." It is also clear that he was familiar with the gun before-hand, since he knew in advance that the gun "look[s] like it got a silencer on it," and had said that he used the same type of gun, a .22 Ruger, on a previous occasion. There are only two reasons why Tomas would have said such things to William: either Tomas was deliberately framing himself for possession of the gun (quite implausi-ble), or Tomas had retrieved a gun from his cousin's house and brought it to William so that William could rob a drug dealer.

Knowing that he cannot show prejudicial error with respect to his possession of the pistol, Tomas instead argues that the error affected the jury's verdict as to the third element of the crime, the gun's travel across state lines. This argument fails as well. Agent Casey testified that Sturm Ruger manufactured its guns in Connecticut and that he had "no knowledge" of Ruger's ever subcon-tracting to an Illinois manufacturer, including "basement manufacturers" and "low-cost individuals." (R. 71 at 310-12.) This was easily enough to support the verdict. *Cf. United States v. Groves,* 470 F.3d 311, 324-25 (7th Cir. 2006) (holding that testimony that there were no "major manufacturers" of firearms in Indiana was insufficient to link an unidentified gun to interstate commerce). Tomas presented no evidence in rebuttal and it seems unlikely, given Casey's testimony about his efforts to keep up with gun manufacturers' practices (R. 71 at 307-08), that any jury would have been inclined to suspect that Ruger had subcontracted its pistol manufacture to an Illinois manu-facturer without Casey's knowledge.

At any rate, leaving the strength of Casey's testimony aside, the evidentiary link between Tomas's prior crimes and the interstate commerce issue is weaker than tenuous. Even thoroughgoing criminals do not care much where their guns come from so long as they function. If they

care at all, it is probably because they are familiar with federal law and want a gun that has *not* crossed state lines.

Tomas argues that the robbery and videotape "drew the jury's attention away from the weakness in the evidence" (Br. of Def.-Appellant at 22) by "focusing the jury's attention on the fact that Tomas was a criminal" (Reply Br. of Def.-Appellant at 5). The idea seems to be that Tomas's robbery and drug dealing so inflamed the jurors that they disregarded their instructions and convicted Tomas even though they were not convinced that the gun crossed state lines. *See, e.g.*, *Owens*, 424 F.3d at 657, *citing Estelle v. Williams*, 425 U.S. 501, 503-05 (1976) (finding that an inflammatory photograph of a defendant in a prison jumpsuit "constant[ly] remind[ed]" the jury of past criminality and "undermine[d] the fairness of the fact-finding process"); *United States v. Green*, 548 F.2d 1261, 1271 (6th Cir. 1977) (holding that irrelevant evidence of intent to distribute drugs was a "highly inflammatory trial tactic which innately prejudiced Appellants' rights to a fair trial"). This argument cannot succeed because, in addition to the reasons already discussed, the jury already knew from other, admissible evidence that Tomas was a robber and drug dealer. Overwhelming evidence showed that Tomas got William a pistol; he did it to help William rob a drug dealer in exchange for half of the promised haul, a brick of cocaine. That is clear not only from William's testimony about the meaning of his February 11 telephone conversation, but also from the February 12 telephone conversation in which Tomas expressed no surprise at William's description of an attempted robbery (Government Ex. 12 at 3-4) and from Tomas's inquiry into whether William was after two "bricks." And weighing in at one kilogram, a brick of cocaine is not something one can consume entirely by oneself; Tomas's only use for that much cocaine would have been to sell it.

*See United States v. Smith*, 34 F.3d 514, 523-24 (7th Cir. 1994) (holding that intent to sell drugs can be inferred from "possession of a quantity of drugs larger than needed for personal use," and noting that one kilogram of cocaine is more than is needed for personal use); *see also United States v. Wash*, 231 F.3d 366, 371 (7th Cir. 2000) (describing witness testimony that more than five grams of crack cocaine suggests an intent to sell); *United States v. Tanner*, 941 F.2d 574, 587 (7th Cir. 1991) (describing witness testimony that possession fifty-five grams of pure powder cocaine was indicative of distribution). The jury thus already had evidence from which to conclude that Tomas was not one to shrink from orchestrating armed robberies and selling drugs. If the jury was improperly inflamed against Tomas, it was not the fault the of challenged evidence.

We are therefore convinced that the jury would not have acquitted if the district court had sustained Tomas's objections below. Consequently, any errors were harmless, and we affirm the judgment of the district court.

A true Copy:

      Teste:

                                 _____
                                 *Clerk of the United States Court of Appeals for the Seventh Circuit*