# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-10251

United States Court of Appeals
Fifth Circuit

**FILED**

April 12, 2018

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

v.

VICTOR MATURINO,

Defendant–Appellant.

Appeal from the United States District Court
for the Northern District of Texas

Before STEWART, Chief Judge, and HAYNES and WILLETT, Circuit Judges.
DON R. WILLETT, Circuit Judge:

The National Firearms Act criminalizes possession of certain unregistered firearms, including silencers and "destructive devices" like grenades. And sentences for such crimes may be enhanced based on the number of devices involved. But what if most of the devices, despite a defendant's best efforts, are incapable of causing destruction—harmless rather than harmful?

In this case, Victor Maturino tried to buy 144 live grenades (plus other firearms) for a Mexican drug cartel, but 143 were inert. The district court, quoting Sentencing Guidelines commentary, imposed an eight-level enhancement based on the number of grenades "sought to be obtained." On

No. 17-10251

appeal, Maturino argues that his sentence should reflect what he *bought* (one live grenade) not what he *sought* (twelve dozen of them). We disagree. Maturino's plan to stockpile live grenades turned out to be a dud, but the sentencing court properly considered what he pursued, not what he possessed.

We AFFIRM.

## I. BACKGROUND

### A. The Sting Operation

Victor Maturino told a DEA confidential source and an undercover ATF agent that he wanted to buy "as many real live grenades" as possible for a "cartel war" in Mexico. Maturino delivered a $3,000 cash down payment for 144 M433 high-explosive, 40-millimeter grenades and a 9-millimeter Beretta pistol equipped with a silencer.[1]

Maturino later met with the source and another undercover ATF agent to seal the deal. Maturino handed over a bag containing $35,000 cash and took possession of two cases, each containing what he believed to be 72 live grenades, plus the Beretta and silencer. Maturino loaded the items into his trunk and was promptly arrested.

Unbeknownst to Maturino, only one grenade was live; the remaining 143 were inert.

### B. The Indictment and Sentencing Filings

Maturino was indicted for possession of an unregistered silencer and possession of an unregistered destructive device (the single live grenade)—both violations of 26 U.S.C. § 5861(d).[2] Maturino pleaded guilty and signed a factual resume detailing the firearms negotiations and stipulating that he requested "as many real live grenades as the [confidential source] could

---

[1] These are not the type of grenades thrown after a safety pin is pulled. M433s are commonly fired from an under-barrel launcher affixed to a rifle.

[2] Maturino was not charged with unlawful possession of the Beretta pistol.

2

acquire." The factual resume covered all the offense elements, and Maturino admitted he knowingly and unlawfully possessed unregistered firearms (the silencer and live grenade) and took possession of the two cases of grenades "expecting them all to be 'live.'"

The pre-sentence report (PSR) assigned a total offense level of 31, including an eight-level enhancement under Guidelines § 2K2.1(b)(1)(D) since the offense involved between 100 and 199 firearms: 144 grenades plus the silencer.[3] Additional enhancements, and Maturino's criminal history category of I, produced an imprisonment range of 108 to 135 months. Maturino objected to the eight-level enhancement, arguing that only the silencer and the single live grenade constituted "firearms"—not the 143 duds. The Government defended the enhancement: Maturino "sought to unlawfully obtain two cases of 'live' grenades"—144 total—and Application Note 5 to § 2K2.1(b)(1) specifically instructs courts to consider the number of firearms "unlawfully sought to be obtained."

The Government filed a PSR addendum stating that conduct relevant to sentencing is not limited to what is charged in the indictment or agreed to in the factual resume.[4] The addendum reurged that Application Note 5 allows a sentencing court to count those firearms "unlawfully sought to be obtained," and that Maturino agreed to purchase 144 grenades—specifically telling undercover agents he wanted "as many real live grenades" as possible.

Maturino again objected, reiterating that Application Note 5 was inapplicable. An inert grenade, he repeated, is not a "destructive device" under § 2K2.1 and thus cannot be considered "relevant conduct" for sentencing.

---

[3] The PSR relied on the 2016 Guidelines and all related amendments.

[4] *See* U.S. SENTENCING GUIDELINES MANUAL § 1B1.3 (U.S. SENTENCING COMM'N 2016) (U.S.S.G.).

No. 17-10251

## C.     The Sentencing Hearing and Statement of Reasons

At the sentencing hearing, the Government reiterated that the sentence calculation should consider intended conduct, not just completed conduct. The district court agreed and adopted without change the findings and conclusions of the PSR and addendum: an offense level of 31 with a resulting imprisonment range of 108 to 135 months. The court then entered a 120-month sentence based, in part, on the number of live grenades "sought to be obtained."

In concluding the sentencing hearing, the district court stated:

> Even if I'm wrong as to these objections, this is the sentence I otherwise would impose because I believe this specific sentence fulfills the 3553(a) factors. Given the seriousness of the offense of conviction, the large quantity of hand grenades that were sought to be obtained, it is important, in my view, that the sentence be sufficient to afford deterrents [sic] to others as well as provide just punishment in this case and therefore a sentence of 10 years is what I believe to be appropriate.[5]

After the hearing, the district court entered its Statement of Reasons (SOR) explaining its adoption of the PSR recommendations and noting that a 120-month sentence was within the Guidelines range. The court repeated that even if its Guidelines calculations were incorrect, 120 months was the sentence it would "otherwise impose under 18 U.S.C. § 3553." Maturino timely appealed.

## II. DISCUSSION

Maturino makes four arguments, but we need only reach the first two:

1. The district court improperly imposed an eight-level enhancement under § 2K2.1(b)(1)(D).

2. The application of enhancements under both subsections (b)(1)(D) and (b)(3)(B) amounts to impermissible double counting under the Double Jeopardy Clause.

---

[5] Transcript of Sentencing Hearing at 13, *United States v. Maturino*, No. 4:16-cr-00215-O (N.D. Tex. Feb. 27, 2017), ECF No. 74.

No. 17-10251

3. Because the district court improperly enhanced his sentence under § 2K2.1(b)(1)(D), it imposed an "above-Guidelines sentence" but failed to provide a sufficient justification for this "alternative sentence."[6]

4. The district court's Statement of Reasons is inconsistent with the court's oral pronouncements at the sentencing hearing.

## A.  The Eight-Level Enhancement under § 2K2.1(b)(1)(D)

This is Maturino's foremost objection. He preserved error below, so we review the district court's fact findings for clear error and its application of the Guidelines de novo.[7]

Maturino contends that § 2K2.1(b)(1)(D) applies only when at least 100 firearms are involved. He insists he possessed just *two* firearms—one live grenade and a silencer—because the 143 inert grenades were not destructive. And if they were not destructive, they were not firearms. And if they were not firearms, enhancement was improper.[8]

First things first. As explained above, Maturino pleaded guilty to Possession of an Unregistered Firearm (the silencer) and Possession of a Destructive Device (the live grenade), both violations of 26 U.S.C. § 5861(d). The maximum sentence for a § 5861 violation is ten years.[9] Below that maximum, the applicable Guidelines section is § 2K2.1.

Subsection 2K2.1(a)(5) provides a base offense level of 18 "if the offense involved a firearm described in 26 U.S.C. § 5845(a),"[10] a description that

---

[6] *See Molina-Martinez v. United States*, 136 S. Ct. 1338 (2016).

[7] *United States v. Booker*, 334 F.3d 406, 412 (5th Cir. 2003).

[8] The term "firearm" is not defined in the text of subsection (b)(1), but Application Note 1 to § 2K2.1 defines "firearm" as "the meaning given that term in 18 U.S.C. § 921(a)(3)." U.S.S.G. § 2K2.1 cmt. n.1. And 18 U.S.C. § 921(a)(3)(D) defines firearm to include "any destructive device"—just like 26 U.S.C. § 5845(a), discussed below. A grenade is a type of "destructive device." 18 U.S.C. § 921(a)(4)(A)(ii).

[9] *See* 26 U.S.C. § 5871.

[10] U.S.S.G. § 2K2.1(a)(5).

includes "a destructive device"[11] (like a grenade[12]) and "any silencer."[13] Since Maturino's offenses involved firearms described in § 5845(a), the PSR set his base offense level at 18, and the district court adopted that starting point.

The "Specific Offense Characteristics" provision, § 2K2.1(b), enhances a sentence in light of surrounding circumstances and conduct, including the quantity of firearms involved. Specifically, subsection (b)(1)(D) provides for an eight-level enhancement if the offense involved 100 to 199 firearms. Because Maturino sought to purchase 144 grenades and a silencer, the PSR recommended this enhancement, which the district court adopted.

Maturino cites various cases holding that an inert grenade is not a destructive device and therefore not a firearm.[14] True, a dud is inoperative rather than explosive. But that factual point eludes the legal point: Maturino pleaded based on what he *possessed*; the district court sentenced based on what he *pursued*. Application Note 5 plainly instructs, "For purposes of calculating the number of firearms under subsection (b)(1), count only those firearms that were unlawfully *sought to be obtained*, unlawfully possessed, or unlawfully distributed."[15] Guidelines commentary is not hortatory fluff. The United States Supreme Court made this clear a quarter-century ago: "[C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative

---

[11] 26 U.S.C. § 5845(a)(8).

[12] *Id*. § 5845(f)(1)(B).

[13] *Id*. § 5845(a)(7).

[14] In *United States v. Osuna*, for example, the Tenth Circuit held that, "'Inert' hand grenades, by definition, are not 'destructive devices' nor can they be 'readily assembled' into 'destructive devices.'" 189 F.3d 1289, 1295 (10th Cir. 1999) (citing *United States v. Blackburn*, 940 F.2d 107, 110 (4th Cir. 1991)). In *Blackburn*, the Fourth Circuit held that an inert grenade is not a destructive device under 26 U.S.C. § 5845(f) while citing our *Malone* decision for the principle that "[a] defendant must possess *every* essential part necessary to construct a destructive device" for the defendant to be in possession of a destructive device. 940 F.2d at 110 (emphasis in original) (citing *United States v. Malone*, 546 F.2d 1182 (5th Cir. 1977)).

[15] U.S.S.G. § 2K2.1 cmt. n.5 (emphasis added).

unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline."[16] The record confirms—irrefutably—that Maturino sought (more to the point, *repeatedly admits* that he sought) "as many real live grenades as the [confidential source] could acquire"—here, 144 of them.[17]

The "sought to be obtained" language in Application Note 5 distinguishes this case from the authority upon which Maturino relies. For example, Maturino cites our 1977 decision in *United States v. Malone* for the proposition that an inert grenade is not a destructive device.[18] *Malone* is inapposite. There, the defendant was challenging his underlying conviction, so we were interpreting the offense statute.[19] It was a case about sufficiency of the evidence (doing the crime), not accuracy of the sentence (doing the time). Indeed, the word "sentence" appears zero times in *Malone*, which, it merits mention, was decided a decade before the Guidelines were formally adopted. Even accepting that inert grenades are not destructive devices, and thus not firearms, *Malone* says nothing about whether a defendant snookered into buying inert grenades may be sentenced for seeking live ones.

Maturino also relies on the Fourth Circuit's 1991 decision in *United States v. Blackburn*, but that case involved an earlier and now-superseded version of the Guidelines. Under the then-controlling Guidelines, a sentence was increased "as the number of firearms *possessed* increase[d]."[20] And

---

[16] *Stinson v. United States*, 508 U.S. 36, 38 (1993).

[17] While the PSR notes that Maturino stated that he hoped to obtain "as many real live grenades as the [confidential source] could acquire," the PSR did not rely on that statement for its recommendations. Nor did the district court rely on it for its decision. We thus need not determine what weight, if any, such generalized statements carry under Application Note 5. Instead, we emphasize that the record shows—conclusively—that Maturino was sentenced based on his scheme to purchase twelve dozen live grenades.

[18] 546 F.2d at 1184.

[19] *See id.* at 1183.

[20] *Blackburn*, 940 F.2d at 108 (emphasis added).

enhancements kicked in where "the offense involved distribution of a firearm, or possession with intent to distribute."[21] The Guidelines were amended barely three months after *Blackburn* was decided, adding Application Note 5 to § 2K2.1 to clarify the scope of a new "Special Offense Characteristics" provision.[22] For 27 years now, Application Note 5 has allowed enhancement where firearms "were unlawfully sought to be obtained, unlawfully possessed, or unlawfully distributed."[23] The addition of "sought to be obtained" shows not only that *Blackburn* is inapt,[24] but also that the Guidelines were intentionally amended to describe a new category of conduct—*distinct from possession*—by which firearms may be counted for sentence-enhancement purposes.

Maturino's position seems to be that a defendant may be sentenced with reference to the quantity of firearms he seeks to obtain, so long as he never receives an inert firearm in the process. At the sentencing hearing, for example, Maturino's counsel conceded that "it could be possible" to apply a § 2K2.1(b)(1) enhancement where "money was exchanged and actual grenades were sought but no inert grenades were delivered." This position is unavailing as a matter of both language and logic.

---

[21] U.S.S.G. App. C amend. 374.

[22] The "Specific Offense Characteristics" subsection referenced by the *Blackburn* court as being § 2K2.2(b) is now § 2K2.1(b)—the provision at issue here. Indeed, § 2K2.2 was deleted by amendment effective November 1, 1991, just three months after *Blackburn* issued. *See* U.S.S.G. § 2 K2.1, Historical Note, *available at* https://www.ussc.gov/guidelines/2015-guidelines-manual/2015-chapter-2-e-k.

[23] U.S.S.G. § 2K2.1 cmt. n.5.

[24] Though *Osuna* was decided in 1999, after the "sought to be obtained" language was added to the Guidelines, the decision does not discuss on what basis the defendant's sentence was enhanced—*i.e.*, whether the enhancement was because the firearms were sought to be obtained, were unlawfully possessed, or were unlawfully distributed. *Osuna*, 189 F.3d at 1294–95. Moreover, *Osuna* cited *Blackburn* as authority for the proposition that inert grenades are not destructive devices. While *Blackburn* may well have been correct on that point—a point we find irrelevant for present purposes—*Osuna*'s reliance on a case that interpreted a version of the Guidelines no longer in effect, without analysis or explanation of its own, renders the decision unpersuasive here.

No. 17-10251

As for language, we favor ordinary meaning that yields determinacy rather than redundancy. Application Note 5 states a court should "count only those firearms that were unlawfully sought to be obtained, unlawfully possessed, or unlawfully distributed."[25] Because "unlawfully possessed" and "unlawfully sought to be obtained" are listed discretely, they operate discretely to target discrete conduct. The phrase "sought to be" does heavy lifting here, and we must not negate its clear meaning. Absent those three words, "unlawfully obtained" and "unlawfully possessed" would be redundant, serving a belt-and-suspenders role perhaps, but adding only emphasis. "These words cannot be meaningless, else they would not have been used."[26] Indeed, reading "sought to be" out of Application Note 5 commits a double interpretive sin: discarding language in order to disregard language. Text is the alpha and the omega of the interpretive process. We cannot revise language (much less repeal it) under the guise of interpreting it. Whether someone possesses an inert grenade has no bearing on whether they unlawfully sought to obtain a real one.

As for logic, the term "sought"—the past tense of "to seek"—must be understood according to its ordinary meaning. Webster's defines the verb "to seek" as, among other things, "to go in search of; look for; search for," as well as "to move or act so as to reach or arrive at."[27] The phrase "sought to obtain," then, imports the concept of searching for or acting to create an opportunity to obtain something. If "sought to obtain" warrants an enhancement for seeking something (144 live grenades), the entirely post hoc event of receiving something different (143 inert grenades) is neither here nor there. What matters under Application Note 5 is what you desired, not what you acquired. It is illogical for the enhancement's appropriateness to turn on delivery, as

---

[25] U.S.S.G. § 2K2.1 cmt. n.5.
[26] *United States v. Butler*, 297 U.S. 1, 65 (1936).
[27] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2055 (1981).

Maturino's counsel suggests—appropriate if someone seeks 144 live grenades but is arrested before the 143 inert ones arrive, but inappropriate if, as here, someone takes immediate possession of all 144.

Plus, as a practical matter, reading § 2K2.1(b)(1) to bar enhancement if the Government uses inert weapons in its sting operations invites absurd—even life-threatening—results. It is nonsensical to require undercover agents to transport 144 live, high-explosive grenades to potential felons, heedless to risks of accidental detonation or theft. The National Firearms Act aims to decrease, not increase, threats to public safety. Maturino's fanciful reading gives a pass to his intended—and admitted—dangerousness.

We hold that a sentencing court may enhance based on the number of firearms a defendant sought to obtain, even if he actually obtained far fewer. This interpretation of Application Note 5 honors its plain, ordinary meaning, averts senseless threats to public safety, and just makes sense.

Not to mention, other circuits have adopted this straightforward reading.[28] In *United States v. Birk*, the Seventh Circuit affirmed an enhancement under subsection (b)(1) where the defendant did not yet possess two pistols but had promised to obtain them in exchange for the sale of a shotgun.[29] The court reasoned that "[t]he Guideline commentary states that a court should consider those firearms 'unlawfully sought to be obtained' when

---

[28] *See, e.g.*, *United States v. Szakacs*, 212 F.3d 344, 348 (7th Cir. 2000) (allowing enhancement based on the number of firearms the defendants intended to steal, even though the defendants were arrested before the robbery was carried out, because "there was evidence of the defendants' intent, their ability to carry out the crime and the contents of the store"), *superseded on other grounds by regulation*, U.S.S.G. amend. 691 (U.S. SENTENCING COMM'N 2006), *as recognized by United States v. Krumwiede*, 599 F.3d 785 (7th Cir. 2010).

The Ninth Circuit reached the same result in an unpublished opinion. *United States v. Rochelle*, 1994 WL 419894, at *4 (9th Cir. 1994) (unpublished) ("[T]he court is to take into account all 'firearms that were unlawfully sought to be obtained' as well as those actually obtained by the offender.").

[29] 453 F.3d 893, 900 (7th Cir. 2006).

determining whether an enhancement is appropriate."[30] The court added, "[w]hile the Guidelines caution against speculative findings, they also 'emphasize the need to consider intended conduct as well as completed conduct.'"[31] The court concluded that there was "more than a sufficient quantum of evidence in the record to support the district court judge's finding that the two pistols formed part of the consideration for the sale of the shotgun," so those pistols were therefore "sought to be obtained" for purposes of Application Note 5.[32]

Here, the record is replete with evidence—from the stipulated factual resume, to the PSR findings and conclusions, to the sentencing hearing transcript—that Maturino sought to obtain 144 live grenades and a silencer, all of which counted as "firearms" under § 2K2.1(b)(1)(D). The district court's sentencing decision was not based on conjecture, and the court did not misapply the eight-level enhancement.

## B.    The Two-Level Enhancement under § 2K2.1(b)(3)(B)

In addition to the eight-level enhancement under (b)(1)(D), the district court applied a two-level enhancement under (b)(3)(B) since the offense involved a "destructive device." Maturino does not argue that enhancement under the latter was inappropriate in and of itself. Instead, he contends that enhancement under both (b)(1)(D) and (b)(3)(B) amounts to impermissible "double counting."

Maturino did not raise this argument below, so we review for plain error.[33] There are four prongs to plain-error review. First, there must be an identifiable error that has not been intentionally abandoned by the appellant.[34]

---

[30] *Id.*

[31] *Id.* (quoting *Szakacs,* 212 F.3d at 348).

[32] *Id.*

[33] *See United States v. Peltier*, 505 F.3d 389, 391–92 (5th Cir. 2007).

[34] *Puckett v. United States*, 556 U.S. 129, 135 (2009).

Second, "the legal error must be clear or obvious, rather than subject to reasonable dispute."[35] "Third, the error must have affected the appellant's substantial rights."[36] Finally, "if the above three prongs are satisfied, the court of appeals has the *discretion* to remedy the error—discretion which ought to be exercised only if the error seriously affects the fairness, integrity[,] or public reputation of judicial proceedings."[37]

Maturino concedes a double-level enhancement, just not a double enhancement. He argues that stacking two separate enhancements under § 2K2.1(b)—one because the offense involved a grenade,[38] another because it involved between 100 and 199 of them[39]—is constitutionally prohibited. Specifically, he asserts, dual enhancements "punish twice for the same harm and violate the Double Jeopardy Clause."

In the context of cumulative sentences, the Supreme Court has explained that "the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended."[40] "Thus, the question of what punishments are constitutionally permissible is not different from the question of what punishments the Legislative Branch intended to be imposed."[41] In light of this, "[w]e have previously noted that the Sentencing Guidelines do not forbid all double counting."[42] Instead, "double counting is impermissible only when the particular guidelines in question forbid it."[43]

---

[35] *Id.*

[36] *Id.*

[37] *Id.* (cleaned up).

[38] U.S.S.G. § 2K2.1(b)(3)(B).

[39] *Id.* § 2K2.1(b)(1)(D).

[40] *Missouri v. Hunter*, 459 U.S. 359, 366 (1983).

[41] *Albernaz v. United States*, 450 U.S. 333, 344 (1981).

[42] *United States v. Godfrey*, 25 F.3d 263, 264 (5th Cir. 1994).

[43] *Id.*

No. 17-10251

The lone question, then, is whether enhancement under both subsections (b)(1)(D) and (b)(3)(B) is expressly prohibited. It is not. Maturino cites nothing in § 2K2.1 nor in any other Guidelines provision that prohibits enhancement under both provisions. And this makes sense. Subsection (b)(1)(D) contemplates the *number* of firearms involved while subsection (b)(3)(B) contemplates the *types* of firearms involved. These enhancement provisions do not, as Maturino puts it, "punish twice for the same harm."

Because the Guidelines do not expressly forbid enhancing a defendant's sentence under both (b)(1)(D) and (b)(3)(B), the district court did not misstep in doing so. Maturino's argument thus fails the first prong of plain-error review.[44]

## III.  CONCLUSION

Victor Maturino requested 144 high-explosive grenades; he received 143 non-explosive grenades. This is a sentencing appeal, though, and what matters for sentencing is what Maturino *actively sought*, not what he *actually bought*. Summing up, the sentencing court properly counted the number of firearms involved in Maturino's offense and did not miscalculate his sentence under the

---

[44] *See Puckett*, 556 U.S. at 135. We need not reach Maturino's third argument, that the district court failed to give a sufficient justification for imposing an above-Guidelines sentence. As explained above, the court's sentencing calculations were within Guidelines, not above them.

Maturino's fourth argument is also unpersuasive. Maturino argues the district court committed reversible error by including in its Statement of Reasons that "[t]his sentence is a downward variance based on the defense's motion at sentencing, pursuant to 18 U.S.C. § 3553(a)." This statement is indeed inaccurate; there was no motion and no variance. On its face, though, "[t]he error is harmless, and clerical in nature." *United States v. Shakbazyan*, 841 F.3d 286, 292 (5th Cir. 2016). First, the sentencing hearing transcript "evinces the district court's thorough explanation of its reasons for imposing" Maturino's 120-month sentence. *Id.* Second, the SOR states that the "court adopts the presentence investigation report without change," notes that the "sentence is within the guideline range," and checks no boxes indicating a departure or variance. In other words, the district court's multiple statements—both oral and written—make clear that the SOR's inadvertent mention of a downward variance was but a trifling misstep, and a harmless one at that.

No. 17-10251

Guidelines. Maturino's plan for live grenades fell short, but close counts in horseshoes and hand-grenade cases.

AFFIRMED.